[No. B232749. Second Dist., Div. Five. Aug. 20, 2012.]

COMERICA BANK, Plaintiff and Respondent, v.
GARY HOWSAM et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts IV.C.5. and IV.E.3.–I.

794

## Counsel

Randolph & Associates and Donald C. Randolph for Defendant and Appellant Gary Howsam.

Hamrick & Evans and A. Raymond Hamrick for Defendants and Appellants GFT Circle Films, Inc., Road Rage Films, Inc., Janus Productions, Inc., GFT Going Back Films, Inc., GFT Heresy Films, Inc., GFT/Redwood KOTN Films, Inc., and GFT/Redwood Ignition Films, Inc.

Costa Abrams & Coate, Charles M. Coate and Theresa E. Johnson for Defendants and Appellants Greenlight Film & Television, Inc., and Charles M. Coate.

Buchalter Nemer, Peter G. Bertrand, Efrat M. Cogan, Robert Addison, Jr., and Cheryl M. Lott for Plaintiff and Respondent.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

This is an appeal involving an international commercial arbitration. It was conducted pursuant to title 9.3 of the Code of Civil Procedure[1] which is entitled, "Arbitration and Conciliation of International Commercial Disputes." (§ 1297.11 et seq.) At issue are the arbitration, not the conciliation, provisions. The arbitration provisions are found in sections 1297.11 through 1297.337.

This case involves appeals from a December 22, 2010 judgment following orders confirming three international commercial arbitration awards. The first arbitration award, issued May 3, 2010, was in favor of plaintiff, Comerica Bank, and against defendants Greenlight Film & Television, Inc., Gary Howsam, GFT Circle Films, Inc., Road Rage Films, Inc., Janus Productions, Inc., GFT Going Back Films, Inc., GFT Heresy Films, Inc., GFT/Redwood KOTN Films, Inc., and GFT/Redwood Ignition Films, Inc. The second award, issued July 16, 2010, was in plaintiff's favor and against Mr. Howsam and Greenlight Film & Television, Inc., and their lawyer, Charles Coate. The third award, issued July 19, 2010, was in plaintiff's favor and against defendants and Mr. Coate. The trial court refused to vacate these three awards and confirmed them.

In the published portion of this opinion, we will discuss four issues. First, we will discuss at some length whether the arbitrator's failure to timely disclose an alleged disqualifying factor enumerated in section 1297.121 is a

---

[1] Unless otherwise noted, future statutory references are to the Code of Civil Procedure.

proper vacatur ground. Defendants assert the failure to timely disclose under sections 1297.121 and 1297.123 is a ground for vacating an international commercial arbitration award. Defendants rely on section 1286.2, subdivision (a)(6), a statutory vacatur ground which requires an award be vacated when an arbitrator fails to timely disclose a potentially disqualifying circumstance. Citing section 1297.135, plaintiff argues this issue cannot even be raised on direct appeal from an order denying a vacatur motion. We agree with defendants that the issue may be raised on direct appeal after a vacatur motion is denied. But we hold the failure to timely disclose potential disqualifying circumstances, as required by sections 1297.121 and 1297.123, is not a ground for vacatur under section 1286.2, subdivision (a)(6). Our ruling in this regard is limited to international commercial arbitrations conducted under section 1297.111 et seq.

Second, we discuss whether the award was secured by corruption, fraud or other undue means. (§ 1286.2, subd. (a)(1).) Among other things, we will analyze whether the arbitrator's billing errors resulted in an award secured by corruption, fraud or other undue means. They did not. Third, we will discuss whether the award resulted from a manifest disregard of the law. It did not. Fourth, we will discuss whether the arbitrator exceeded his power when he decided alter ego issues. He did not. We affirm the orders denying the vacatur motion and confirming the award and the judgment.

## II. FIRST AMENDED COMPLAINT FILED SEPTEMBER 7, 2004

The original complaint was filed on June 1, 2004. According to the first amended complaint, on November 27, 1999, plaintiff made loans totaling $37 million to Mr. Howsam and seven Ontario, Canada, corporations controlled by him. Mr. Howsam is alleged to be a Toronto, Ontario, resident. The loans were to fund the production of seven different films. The loans were paid to all of the foregoing corporate defendants except Greenlight Film & Television, Inc. The loans were secured by the proceeds of the seven films. The primary "collateral" was foreign distributors' minimum licensing fees. The collateral was in the form of guaranteed minimum license fees funded by foreign distributors. The first amended complaint alleges that certain documents that were necessary pursuant to the loan agreements were forged. The forged documents consisted of license agreements and notices and acknowledgments of assignments (assignment notices). The forged assignment notices required the foreign distributors to directly pay plaintiff rather than defendants. The forged documents induced plaintiff to make the loans. The first

amended complaint contains extensive alter ego allegations.[2] Plaintiff never recovered the full amount of the loans and the security was worthless.

Plaintiff was owed in excess of $20 million. The causes of action were for contract breach, fraud, conspiracy to defraud, fraudulent inducement, an accounting, money had and received, account stated, and open book account. Plaintiff sought compensatory damages of not less than $20 million, interest, punitive damages, an accounting, imposition of a constructive trust, injunctive relief, attorney fees, and costs.

## III. PROCEDURAL HISTORY

### A. Overview

This appeal from a judgment after confirmation of three international commercial arbitration awards involves an extraordinarily complex series of

---

[2] The first amended complaint filed on September 7, 2004, contains the following alter ego allegations: "On information and belief, Comerica alleges that Defendant GFT was created by Howsam as part of a scheme to escape liability for the actions of Defendant Greenlight (detailed below), and to simply continue Greenlight's business, but under a new name. For these, and possibly other, reasons, GFT, as Greenlight's successor, is liable for Greenlight's wrongful actions alleged herein. Therefore, even though Comerica is informed and believes that GFT was not incorporated until after most or all of the wrongful actions at issue in this case, the allegations contained herein include GFT as if it *had* been incorporated at the time of the actions. [¶] . . . For the reasons set forth . . . above, Howsam, Greenlight, GFT, GFT-Circle, Road Rage, Janus, GFT-Going Back, GFT Heresy, GFT-KOTN, GFT-Ignition, and/or their agents and assigns, are hereinafter sometimes collectively referred to as the 'Howsam Parties.' On information and belief, Comerica alleges that the Howsam Parties are, individually and jointly, and at all times material hereto have been owned, controlled or otherwise dominated by Howsam. Comerica is further informed and believes and based thereon alleges that, at all times relevant hereto, the Howsam Parties, and each of them, was the agent, partner or other representative of the remaining Howsam Parties, and completely controlled, dominated and operated the Howsam Parties, and at all times mentioned herein was acting within the course and scope of that agency, partnership or representation. Comerica is further informed and believes and based thereon alleges that the acts and conduct of each of the Howsam Parties as alleged herein were known to, authorized by, and/or ratified by the other Howsam Parties, and each of them. [¶] . . . On information and belief, Comerica alleges that there now exists, and at all times material hereto has existed, such a unity of ownership, interest and control between the Howsam Parties, on the one hand, and Howsam, on the other hand, that any individuality or separateness which may have existed between the Howsam Parties, on the one hand, and Howsam, on the other hand, has ceased. The Howsam Parties are the alter egos of Howsam in that Howsam has completely controlled, dominated, managed and operated the Howsam Parties, and has used those entities as mere shells or conduits through which to carry on his own business, including engaging in the acts and/or omissions set forth herein. Adherence to the fiction of the separate existence of the Howsam Parties, on the one hand, and Howsam, on the other hand, would permit an abuse of corporate privilege and would sanction fraud and promote injustice. The Howsam Parties and Howsam are consequently jointly and severally liable to Comerica for the conduct, or lack of conduct, of each other with respect to the obligations and omissions as hereafter alleged."

events. The defaulted loans described in the first amended complaint resulted in federal bank fraud indictments against Mr. Howsam and Harel Goldstein. Mr. Goldstein was arrested by Federal Bureau of Investigation special agents. Mr. Goldstein pled guilty and then participated in a federal bank fraud investigation which targeted Mr. Howsam. Mr. Howsam was then indicted. Later, the indictment was dismissed against Mr. Howsam. The indictment against Mr. Howsam was returned after the first amended complaint was filed and the arbitration had commenced. A lengthy stay in the arbitral proceedings ensued until the indictment was dismissed. Proceedings resumed but later defendants withdrew from the arbitration and the arbitrator entered their default. An uncontested award was entered.

The difficulty in reciting the procedural scenario after Mr. Howsam's indictment was dismissed is that proceedings were sometimes simultaneously pending in the arbitral forum, before both the arbitrator and the arbitration administrator, the trial court, before us and the California Supreme Court, or in the federal courts. It is difficult to recite the somewhat confusing events simultaneously transpiring in different forums. But for purposes of clarity, we will set forth the events in strict chronological order. (Remarks of Sen. Ted Stevens on the death of Steven Ambrose, 107th Cong., 2d Sess., p. 20215 (2002) ["abandon chronology at your peril . . ."].)

### B. Events Occurring After the First Amended Complaint Was Filed and Before the Stay Was Entered

On October 25, 2004, seven defendants, except for Mr. Howsam and Greenlight Film & Television, Inc., made a written demand to arbitrate the claims alleged in the first amended complaint. The bases of the seven defendants' motion to compel arbitration were the agreements to arbitrate contained in the assignment notices. On October 27, 2004, defendants, other than Mr. Howsam and Greenlight Film & Television, Inc., filed a motion to compel arbitration. On October 27, 2004, Mr. Howsam and Greenlight Film & Television, Inc., filed a motion to quash on absence of jurisdiction grounds. On December 15, 2004, the motion to quash of Mr. Howsam and Greenlight Film & Television, Inc., was denied. On December 28, 2004, the motion to compel arbitration filed by defendants, other than Mr. Howsam and Greenlight Film & Television, Inc., was denied. The mandate and review petitions challenging the December 15, 2004 order denying the motion to quash filed by Mr. Howsam and Greenlight Film & Television, Inc., were denied. (*Greenlight Film & Television, Inc. v. Superior Court* (July 13, 2005, S133354) [order]; *Greenlight Film & Television, Inc. v. Superior Court* (Apr. 14, 2005, B180285) [order].) On September 15, 2005, in an unpublished opinion, we reversed the December 28, 2004 order denying the motion to compel arbitration. (*Comerica Bank v. GFT Circle Films, Inc.* (Sept. 15, 2005,

B180622) [opn.].) Mr. Howsam and Greenlight Film & Television, Inc., had filed a certiorari petition in the United States Supreme Court challenging the December 15, 2004 order denying their motion to quash. On November 7, 2005, the certiorari petition of Mr. Howsam and Greenlight Film & Television, Inc., was denied by the United States Supreme Court. (*Howsam v. Superior Court* (2005) 546 U.S. 1003 [163 L.Ed.2d 505, 126 S.Ct. 623].)

After the jurisdictional issue and appellate litigation involving them concluded, on November 22, 2005, Mr. Howsam and Greenlight Film & Television, Inc., moved to compel arbitration. Mr. Howsam and Greenlight Film & Television, Inc., reasoned they were entitled to compel arbitration under the assignment notices. On February 7, 2006, defendants, other than Mr. Howsam and Greenlight Film & Television, Inc., joined in the motion to compel arbitration. On February 14, 2006, the motion of Mr. Howsam and Greenlight Film & Television, Inc., to compel arbitration and stay the action was granted. On April 10, 2006, the written order granting the motion to compel arbitration and completely staying the action was filed. Trial on plaintiff's first amended complaint was stayed pursuant to section 1297.82.[3]

On May 9, 2006, Mr. Goldstein settled with plaintiff. In 2002, after being sued by plaintiff, Mr. Goldstein and his wife sought the protection of the bankruptcy courts. At the time of the settlement, there was a pending adversary proceeding initiated by plaintiff in the bankruptcy court. The adversary proceeding sought a determination that Mr. Goldstein's debts owed to plaintiff, as a result of the transactions at issue here, were nondischargeable. Under the terms of the settlement, plaintiff received $300,000. There was a qualified confidentiality clause in the settlement agreement. Plaintiff agreed to provide specified notice to Mr. Goldstein if it received a court order to turn over information concerning the settlement. The qualified confidentiality agreement states in part: "[Plaintiff] and its attorneys or agents further agree that should any party (other than any of the Excepted Parties) request from [plaintiff] information regarding the Settlement Agreement, any terms or conditions contained therein, or facts underlying the Settlement Agreement, [plaintiff] shall provide such information only upon: (a) H. Goldstein's prior written consent; or (b) if required by court order or subpoena (collectively, the 'Court Order'). Should [plaintiff] receive such a request or Court Order for such information related to this Settlement Agreement, [plaintiff] shall provide H. Goldstein and his counsel with written notice (together with a

---

[3] Section 1297.82 states, "A timely request for a stay of judicial proceedings made under Section 1297.81 shall be granted." Section 1297.81 provides, "When a party to an international commercial arbitration agreement as defined in this title commences judicial proceedings seeking relief with respect to a matter covered by the agreement to arbitrate, any other party to the agreement may apply to the superior court for an order to stay the proceedings and to compel arbitration."

faxed version of the Court Order, if existent) no later than twenty-four (24) hours of receipt of such request or Court Order. [Plaintiff] is permitted to disclose the information as required by the Court Order only if: (a) H. Goldstein does not advise [plaintiff] within seventy-two (72) [hours] of receipt of [plaintiff's] notice, that he intends to seek a protective order; (b) H. Goldstein does not file a motion, application or request for protective order within five (5) calendar days of his receipt of [plaintiff's] notice unless the Parties mutually agree to extend such time period; or (c) H. Goldstein's request for a protective order is denied. In no event shall [plaintiff] be obligated to obtain a protective order."

In September 2007, Mr. Goldstein was charged with a single count of bank fraud. Shortly thereafter, Mr. Goldstein pled guilty. On September 18, 2007, plaintiff served a demand that arbitration be conducted under the auspices of the Independent Film & Television Alliance (the alliance). The September 18, 2007 demand seeks damages in excess of $13 million and attached the first amended complaint. As noted, the first amended complaint alleges that plaintiff is owed in excess of $20 million.

The arbitration was conducted under the alliance's "Rules for International Arbitration." Under its international commercial arbitration rules, the alliance acts as the administering agency. The alliance's president, acting as "The Arbitral Tribunal," designates a staff member as the "Arbitral Agent." Richonda Starkey was designated by the alliance's president as the Arbitral Agent. The alliance's Arbitral Agent administers much of the arbitration including assisting in the selection or removal of the arbitrator. A party has a right to challenge a sitting arbitrator. Under such circumstances, the Arbitral Agent determines whether to replace the arbitrator.[4]

---

[4] The alliance's international arbitration rules state in part: "6.6 An Arbitrator may be challenged if circumstances exist which give rise to justifiable doubt as to the Arbitrator's impartiality or independence as to the matter or parties at issue. [¶] 6.6.1 A party may challenge an Arbitrator by giving notice of his/her challenge to the other party, to the Arbitrator and to the Arbitral Agent. Such notification shall be in writing and shall state the reasons for the challenge, and must be made within seven (7) business days after discovery of the facts on which the challenge is based, but prior to the Arbitrator's issuance of a final award or tentative final award. The Arbitral Agent may, in his/her sole discretion, suspend or continue the arbitral proceedings during the pendency of the challenge. [¶] 6.6.2 When an Arbitrator has been challenged by one party, the other party may agree to the challenge and substitution of a new Arbitrator; the Arbitrator may withdraw from his/her office as Arbitrator; or the Arbitral Agent may determine without passing on the bona fides of the grounds of challenge that a sufficient issue exists to justify the replacement of the Arbitrator and appointment of a new Arbitrator. Removal or replacement of an Arbitrator under any of these circumstances shall not imply acknowledgment of the truth or the validity of the grounds for the challenge. If an Arbitrator is removed after an arbitration hearing, but prior to the issuance of an award, then a new hearing will be held. If the Arbitrator has issued a final award or a tentative final award, then no removal or replacement of the Arbitrator shall take place. [¶] 6.6.3 In the event that a new

Rules 6.1 through 6.3 of the alliance's international commercial arbitration rules identify how the arbitrator is selected.[5] On October 30, 2007, Ms. Starkey, the alliance's Arbitral Agent, circulated a list of potential arbitrators. Pursuant to paragraph 6.3 of the alliance's arbitration rules, Steven Strick was listed as one of the potential arbitrators. Mr. Strick's resume cataloged his undergraduate and graduate degrees; his employment by various law firms including Loeb & Loeb (1977–1980), Talmadge, Pritzger & Strick (1981–1989), and Rubin, Bailin & Ortoli (2001–2007); his employment in the entertainment industry by United Artists Corporation (1975–1977), Home Box Office, Inc. (1980–1981), Dino DeLaurentis Corporation (1981–1989), Art & Commerce Entertainment, Inc. (1989–1994) and CST Entertainment

---

Arbitrator must be appointed under Rule 6.6.2, the new Arbitrator shall be designated by the Arbitral Agent in the same manner as set forth in this Rule 6. If a second or subsequent Arbitrator is similarly replaced, the Arbitral Agent may in the interest of expeditious resolution of the dispute designate the new Arbitrator without necessity to resubmit any list of names to the parties. [¶] 6.6.4 If the Arbitral Agent declines to exercise the option to replace the Arbitrator as referred to in Rules 6.6.2 and 9.1, the Arbitrator shall continue as the Arbitrator for the dispute and the challenge shall be deemed to have been overruled. [¶] 6.6.5 In the event of the death, incapacity, resignation, or failure or other inability of an Arbitrator to act at any time after appointment, the Arbitral Agent shall appoint a successor Arbitrator under Rule 6.6.3. [¶] 6.6.6 The Arbitral Agent, in his/her sole discretion, may remove any Arbitrator who does not comply with the provisions of Rule 9.1. If any such Arbitrator is removed, the new Arbitrator shall be designated by the Arbitral Agent in the same manner as set forth in Rule 6. [¶] 6.6.7 The Arbitral Agent's decision as to the appointment, confirmation, challenge or replacement of an Arbitrator will be final and the reasons for such decision will not be communicated."

[5] Rules 6.1 through 6.3 of the alliance's international arbitration state: "6.1 Promptly upon receipt of the Notice of Arbitration, the Arbitral Agent shall transmit to each of the parties (if possible by fax, email or other electronic means) a copy of the Notice of Arbitration, a copy of the [Independent Film & Television Alliance] Rules, and a list of not less than three (3) proposed Arbitrators if reasonably practicable, showing the name, address and resume of each proposed Arbitrator. [¶] 6.2 Within five (5) business days of receipt of the proposed list of Arbitrators, each party shall return the list deleting therefrom any names of Arbitrators unacceptable to that party. The remaining names on the list shall be rated in numerical order showing as number one, the person most favored, number two, the person next most favored, etc. [¶] 6.3 Within seven (7) days of the receipt of the list from each of the parties or five (5) days from the last day provided for the return of the list in Rule 6.2, whichever occurs earlier, the Arbitral Agent shall designate as the Arbitrator for the dispute the person available to serve as Arbitrator who has received the most favorable acceptance on the lists returned by the parties. If two or more proposed Arbitrators receive equally favorable acceptance from all parties, then the Arbitral Agent shall designate an Arbitrator from among them. If no proposed Arbitrator receives favorable acceptance from all parties, then the Arbitral Agent shall submit a list of not less than three (3) alternate proposed Arbitrators, if reasonably practicable, to the parties for rating in accordance with Rule 6.2. The Arbitral Agent shall then designate an Arbitrator in accordance with this Rule. If no proposed Arbitrator on the alternate list receives favorable acceptance from all parties, then, in the interest of expeditious resolution of the dispute, the Arbitral Agent shall designate an Arbitrator whose name has not previously been submitted, without the necessity of resubmitting names to the parties. Each of the parties and the Arbitrator shall be promptly notified of the selection of the Arbitrator."

Inc. (1994–2001); and his professional relationships including his membership in the association of the bar of the City of New York. Nothing in Mr. Strick's resume stated he was a member of the State Bar of California. On November 2, 2007, defendants moved to quash service of the notice of arbitration. Also, on November 2, 2007, Mr. Howsam and Mr. Goldstein met in a local restaurant. Mr. Goldstein was cooperating with the Federal Bureau of Investigation and the meeting was video recorded.

On November 6, 2007, plaintiff listed Mr. Strick as its first preference as the arbitrator. On November 5, 2007, Mr. Howsam was arrested by the Federal Bureau of Investigation on bank fraud charges. The charges arose out of the loan transactions at issue in this case. On November 9, 2007, defendants, other than Mr. Howsam and Greenlight Film & Television, Inc., listed Mr. Strick as their second choice to serve as the arbitrator. Plaintiff struck defendants' first choice to act as the arbitrator, Bruce Polichar. One of plaintiff's attorneys explained: "[Their] first choice, [Mr.] Polichar, stated that 'I have acted as a mediator in several superior court cases in which Mr. Coate represented one of the litigants.' On that basis, [plaintiff] elected to strike Mr. Polichar. Therefore Mr. Strick was [their] first eligible choice."

On November 12, 2007, Mr. Strick was designated as the arbitrator. The parties were each individually assessed an initial $1,500 charge. The arbitrator's rate was $300 per hour. Mr. Howsam was indicted on November 27, 2007, on federal bank fraud and making false statements in loan documents charges. As noted, the fraud and loan documents involve the unpaid debts in this case.

On December 5, 2007, a preliminary telephonic hearing was held and the arbitrator scheduled a hearing on a motion to quash, scheduled another preliminary hearing, and noted that plaintiff had withdrawn its opposition to the arbitration tribunal's jurisdiction. On January 3, 2008, the arbitrator denied defendants' motion to quash service of the arbitration notice which had been filed November 2, 2007. The arbitrator ordered defendants to answer plaintiff's notice of arbitration and file any cross-claims within 30 days. The arbitrator selected January 10, 2008, as the date for a further preliminary hearing.

On January 9, 2008, Mr. Howsam and Greenlight Film & Television, Inc., moved to stay the arbitration. The stay motion was based on the fact Mr. Howsam had been indicted. The remaining defendants joined in the stay motion. On January 21, 2008, the parties agreed to stay the arbitration for six months given Mr. Howsam's indictment. The parties later stipulated to extend the stay pending the outcome of Mr. Howsam's indictment. On April 27, 2009, Mr. Howsam's indictment was dismissed without prejudice.

C. Events Occurring After the Stay Was Terminated and
Before Defendants Withdrew from the Arbitration

On May 4, 2009, plaintiff indicated its desire to resume arbitral proceedings to the alliance. On May 21, 2009, Mr. Strick made the following disclosure: "I wish to disclose the following: [¶] Over the past years, I represented a client that maintained checking accounts at Comerica Bank ('CB'). While I had signatory authority on some of the accounts, I have never had any personal interest in the company, its subsidiaries, the CB accounts or the proceeds thereof. I no longer represent the client, do not retain signatory authority on any such account and have no ongoing business or other relationship with CB. I am not now nor have I ever been a customer of CB or had any personal relationship with any of its officers or employees. [¶] In my opinion the facts here disclosed do not constitute a conflict with regard to the present arbitration, nor have they or will they in any way affect my impartiality and neutrality as arbitrator and would not be grounds for disqualification given the attenuated nature of the relationship. Nevertheless I make this information available to the parties in what I believe to be an abundance of caution."

On June 9, 2009, defendants were ordered to file responsive pleadings by June 30, 2009. On June 30, 2009, Mr. Howsam and Greenlight Film & Television, Inc., demurred to the first amended complaint and the notice of arbitration and filed a motion to strike. On July 21, 2009, the arbitrator scheduled a September 3, 2009 hearing on a variety of issues.

On September 3, 2009, the scheduled hearing was held. Also on September 3, 2009, plaintiff filed a first amended notice of arbitration. The first amended notice of arbitration alleges plaintiff has been damaged in a sum in excess of $13 million. The first amended notice of arbitration also refers to the first amended complaint which alleges plaintiff has been damaged in excess of $20 million. On September 9, 2009, the arbitrator issued a four-page single-spaced ruling addressing various motions and issues raised at the September 3, 2009 hearing which overruled defendants' demurrer to the first amended complaint, granted the motion to strike punitive damage allegations from the arbitration notice, ruled alter ego issues were properly part of the arbitration, and set a date for additional issues to be resolved.

On September 21, 2009, the arbitrator issued rulings concerning the scheduling of hearings on discovery disputes, the approval of a deposition subpoena of Mr. Goldstein, the discovery cutoff date, the dates for exchanges of expert witness information, other hearing dates, and the setting of the final hearings commencing February 22, 2010. The arbitrator expressly ruled that the statute of limitations on plaintiff's claims was tolled upon the June 1,

2004 filing of the complaint. On November 19, 2009, Mr. Howsam and Greenlight Film & Television, Inc., objected to orders providing for formal discovery: "Under the circumstances, a preliminary determination must be made if general [alliance] rules prohibiting formal discovery are to be deviated from in the first instance. If and only if, a determination that the interests of justice require procedures not regularly provided for will nevertheless be provided for here, then Respondents must obviously have the opportunity to propound their own formal discovery. It can hardly be disputed that such [alliance] discovery will be extremely costly and burdensome and antithetical to the policies underlying arbitration in the first instance. However, when the claimant is a bank employing a law firm with unlimited resources, the true need for all of this discovery from the standpoint of Respondents is to make the cost of the proceeding prohibitively expensive . . . ." On November 20, 2009, the arbitrator issued orders limiting plaintiff's admission requests to five distinct areas, directing the parties confer concerning discovery issues, directing all parties to produce their core documents by December 11, 2009, compelling production of noncore documents by December 18, 2009, limiting each side to three depositions, concerning possible stipulated facts, permitting use of letters to raise discovery disputes, and requiring payment of all arbitrator fees by November 25, 2009.

As noted, there was a video recording of the November 2, 2007 restaurant meeting between Mr. Howsam and Mr. Goldstein. On November 23, 2009, United States District Court Judge Otis D. Wright ordered the video recording unsealed over Mr. Howsam's objection. In connection with the unsealing proceedings, Assistant United States Attorney Gregory A. Lesser wrote: "The government . . . notes, . . . based upon the evidence presently before it, the government does not intend to further prosecute . . . Howsam for the offenses alleged in the indictment and/or any related offenses involving similar loans obtained by Howsam from Comerica Bank."

On November 20, 2009, the arbitrator issued an extensive order concerning discovery issues. The November 20, 2009 order extended to the scope of admissions requests, document production, allowing plaintiff to depose Mr. Howsam and two other witnesses, stipulated facts, and the manner in which discovery disputes were to be resolved. In addition, the arbitrator ordered, "Counsel for each of the parties shall contact [Ms. Starkey] on or before November 25, 2009 to make arrangements for the payment of all outstanding fees relating to these proceedings."

On November 30, 2009, defendants served admissions requests. On December 14, 2009, defendants served amended admissions requests. Defendants' motion to quash a subpoena duces tecum was denied on mootness

grounds after Judge Wright ruled the video recording could be released. The video recording was of the meeting between Mr. Howsam and Mr. Goldstein.

On December 22, 2009, the arbitrator issued a further order concerning fees: "[Plaintiff] and [defendants] shall bear . . . arbitrator fees equally (i.e.[,] fifty percent of such fees shall be borne by [plaintiff] and fifty percent by [defendants]) after the previously billed arbitrator deposits have been depleted. A final allocation of arbitration related costs and expenses among the parties will be made at the close of the proceeding." Defendants had previously been ordered to pay three-fourths of the arbitrator's fees. In addition, the arbitrator ordered plaintiff to respond to 10 supplemental admission requests.

On December 24, 2009, Mr. Howsam and Greenlight Film & Television, Inc., filed a terminating sanctions and disqualification motion in the trial court. Defendants sought to disqualify plaintiff's counsel on misconduct grounds. On December 30, 2009, counsel for Mr. Howsam and Greenlight Film & Television, Inc., requested a discovery stay or the opportunity to file a motion to that effect: "Under California law the continued prosecution of discovery by Claimant of this matter under the circumstances of this case raises constitutional issues and it is my understanding that you have now been served with a copy of a stay motion by associate counsel addressing the same. Further, continued prosecution of this discovery with a motion for terminating sanctions and a motion to disqualify for violation of the California Rules of Professional Conduct is contrary to law and compounds Claimant's violations. We object to such efforts while such motion is under consideration by the Superior Court. Under the circumstances, would request a stay of discovery, or alternatively, leave to file a motion for stay of such discovery while such substantive matters are pending." On December 31, 2009, Mr. Howsam and Greenlight Film & Television, Inc., filed a motion *in the trial court* to stay the arbitration until April 14, 2011. April 14, 2011, is the date when the criminal statute of limitations would run on Mr. Howsam's dismissed federal bank fraud and related charges.

On January 6, 2010, the arbitrator denied the December 30, 2009 stay request: "I have Claimant's motion to compel production of documents and for monetary and evidentiary sanctions. Respondents may file their opposition by January 13, 2010; Claimant may reply by January 18, 2010. [¶] I also have Respondents' letter to me of December 30, 2009, requesting a stay of discovery, or leave to file a motion for leave to stay discovery. Motion for stay is DENIED. However, Respondents are granted leave to file their motion by January 13, 2010; Claimant may file its opposition by January 20; if Respondents wish to reply they may do so by January 25, 2010. Unless and until a stay is granted, all discovery deadlines remain in effect. [¶] All

documents ordered produced under this tribunal's order of November 20, 2009 shall be produced forthwith, but not later than January 13, 2010. [¶] I would like to hold a hearing next week to consider outstanding issues including current discovery issues, prehearing scheduling and procedural issues next week. Please let me know in advance if you have any agenda items to add. I will get back to you with a proposed date/time and location."

On January 8, 2010, Mr. Howsam and Greenlight Film & Television, Inc., filed another stay motion before the arbitrator: "In absence of a current stay of this proceeding as previously requested, but further to the leave granted to move for a stay of this proceeding, without prejudice to Respondents' pending motions in the Superior Court, Respondents herein give notice of their motion and herein move for stay of this proceeding pursuant to · [alliance] Rules 8.1, 9.1, 9.2 and 9.4, *inter alia*, at a hearing to be determined. Counsel for Respondents offers the use of the undersigned's conference room for such purpose. [¶] The foregoing rules provide you with the equitable discretion to stay this arbitral proceeding until such substantive motions are adjudicated and finally resolved. [¶] The basis of the request for a reasonable stay of this proceeding until such motions are adjudicated and finally resolved is correspondingly set forth in the pending substantive motions before the Superior Court . . . ."

On January 11, 2010, the other defendants filed a joinder in the December 24, 2009 sanctions and disqualification motions of Mr. Howsam and Greenlight Film & Television, Inc. As noted, the sanctions and disqualification motions of Mr. Howsam and Greenlight Film & Television, Inc., were filed in the trial court on December 24, 2009. On January 14, 2010, the arbitrator ordered that Mr. Howsam's deposition commence on February 9, 2010. On January 27, 2010, a hearing was held on a stay request, document production and depositions, and scheduling of further proceedings relating to in limine motions and plaintiff's demurrer.

On February 2, 2010, the trial court denied defendants' terminating sanctions and disqualification motion. In addition, the trial court denied the motion filed December 31, 2009, of Mr. Howsam and Greenlight Film & Television, Inc., to stay the arbitration proceedings. On February 8, 2010, the arbitrator granted plaintiff's motion to compel document and privilege log production: "On or before February 22, 2010 each of the parties shall produce and deliver to the Los Angeles office of opposing counsel, documents previously ordered produced by this tribunal pursuant to orders dated November 20, 2009 and January 14, 2010, which document production shall be organized in the six general categories identified by [plaintiff's] counsel. Counsel shall concurrently with such production, produce and deliver privilege logs identifying and describing any documents for which privilege or a

legally imposed restriction prohibiting disclosure is asserted together with the privilege or prohibition claimed and the reason for the claimed privilege or prohibition. Counsel shall promptly advise and petition this tribunal in connection with any challenge to any privilege or legal prohibition asserted by opposing counsel." (Fn. omitted.) In addition, on February 8, 2010, the arbitrator denied defendants' stay motion, ordered Mr. Howsam to be deposed in Toronto, Ontario, Canada, on March 12, 15 and 16, 2010, scheduled hearings on in limine motions and plaintiff's demurrer to an amended cross-complaint, and scheduled the hearings on the merits of the parties' claims for April 12 through 27, 2010.

On February 11, 2010, defendants requested reconsideration of the arbitrator's February 8, 2010 revised ruling. A hearing on defendants' reconsideration request was held on February 12, 2010. On February 16, 2010, the arbitrator issued his ruling on defendants' reconsideration request. The arbitrator denied defendants' stay request, reserved ruling on the surveillance evidence in limine motion, overruled plaintiff's demurrer, and issued orders concerning depositions.

On February 23, 2010, at 5:10 a.m. from New York City, the arbitrator raised the issue of unpaid fees in an e-mail to all counsel: "Thank you Mr. Bertrand. Receipt is acknowledged. We will take up the issues at tomorrow's scheduled hearing. [¶] In the meantime, I invite [defendants'] counsel to respond if they choose in advance of our scheduled teleconference tomorrow. [¶] Also, I have been informed by my office that despite several messages and [e-mails], long outstanding invoices for arbitrator fees have not been paid. I would like to remind counsel that under [the alliance's] Rules, failure to make deposits may be grounds for default. The relevant section is cited below. [¶] '14.3 At any time after the commencement of the arbitration process, the Arbitral Agent or the Arbitrator shall have the right to require each party to deposit with the Arbitral Agent or the Arbitrator an equal amount as an advance against the Arbitrator's fees. The Arbitrator shall give formal notice of any such failure to meet the deposit requirements and the consequences of such failure. The failure of any party to respond to such requests may be deemed by the Arbitrator to be a default under Rule 11 above. The Arbitral Agent shall transmit all deposits upon receipt to the Arbitrator.' [¶] Please make arrangements with my office for immediate payment of all outstanding invoices in advance of tomorrow's call."

Also on February 23, 2010, Mr. Coate, counsel for Mr. Howsam and Greenlight Film & Television, Inc., wrote Ms. Starkey from Santa Monica and complained about the arbitrator's billings. Mr. Coate complained to Ms. Starkey about the alleged terseness of the description of the arbitrator's expenditure of time and the advance retainer of $15,000: "With regard to the

arbitrator's most recent invoice #5, (a copy of which is attached) it is noted that Arbitrator Strick in response to an ordered request that was required to be briefed and heard, reallocated fees so that they are fairly split 50/50 between [plaintiff] on one side, and [defendants] on the other, but no credit has been provided to [defendants] for amounts that they previously paid in excess of such equal split on this invoice. We would ask for a proper recalculation so that prior amounts that were overpaid by [defendants] are properly allocated and that the invoice is accurately calculated to take such prior overpayments into account. [¶] Also, we note a terseness or lack of description for many of the billing entries, and unfortunately are forced to query the time represented to be expended in connection with numerous entries. It is noted that in relation to the documents reviewed, a number of time descriptions do not appear to correspond in a meaningful way. For example, on December 3, 2009, 2.75 hours are charged for simply 'Review file' and a half hour is expended reading a single letter on December 15, 2009. [¶] We also note that the lion's share of the invoice does not address time that has already earned, but rather seeks a large advance retainer of fifteen thousand dollars ($15,000.00) that does not appear to be in relation to any task, or hearing, which is set in April. No explanation as to what this advance is for or entails is provided. We would kindly ask for some guidance from [the alliance] in this regard, especially when Arbitrator Strick today has threatened with virtually no notice the possible imposition of default tomorrow for failure to pay such invoice, notwithstanding the above. We do not believe that such a serious matter can be addressed in such a summary fashion and trust that [the alliance] concurs with such concerns in light of the above."

On February 24, 2010, Mr. Howsam and Greenlight Film & Television, Inc., filed a mandate petition in this court challenging the trial court's February 2, 2010 order denying their stay motion. On the same date, Mr. Howsam and Greenlight Film & Television, Inc., filed a separate mandate petition in this court. The second petition challenged the trial court's February 2, 2010 order denying their terminating sanctions and disqualification motions.

At a February 24, 2010 hearing before the arbitrator, defendants raised the issue of a stay pending our resolution of the two mandate petitions. Also, the parties litigated issues concerning document production, fee allocation, and deposition duration allocation. In his February 26, 2010 written order, the arbitrator ruled on the issues raised at the February 24, 2010 hearing: and denied defendants' stay request, issued orders in connection with document production, and reserved ruling on questions concerning allocation of time at depositions. In addition the arbitrator addressed the issue of his fees: "The Tribunal notes [defendants'] comments with regard to a split of [alliance fees] and its petition for an accounting and a credit. It is further noted that [Ms. Starkey] determined at the beginning of this proceeding that under

[alliance rules], arbitrator fees and expenses would be split 3/4 - 1/4 between [defendants and plaintiff], but that pursuant to paragraph 2 of the Order dated December 22, 2009, this Tribunal ordered an equal split between [defendants] and [plaintiff] on a prospective basis, and ruled that a final allocation of arbitration related costs and expenses would be made at the close of proceedings. [Defendants'] petition for an immediate accounting and credit of fees is DENIED. . . . In the meantime, [defendants] are ordered to immediately pay their share of outstanding [alliance] arbitrator deposits in accordance with [alliance rule] 14.3." (Fns. omitted.) One of the omitted footnotes states the arbitrator had previously requested payment of fees on January 13, 2010. On February 27, 2010, plaintiff noticed Mr. Howsam's deposition.

On February 28, 2010, the arbitrator calculated his paid and unpaid fees. He had expended 53.25 hours at a billing rate of $300 per hour for a total due of $15,975. Plaintiff had deposited $12,000. Defendants had not deposited any moneys for arbitrator fees. The outstanding balance was $3,975. In addition, the arbitrator had ordered each side to post $15,000. Thus, on February 28, 2010, plaintiff, which had already deposited $12,000, was to pay an additional $16,987.50. Defendants, who had made no deposit, owed $28,987.50. On March 2, 2010, Mr. Coate, counsel for Mr. Howsam and Greenlight Film & Television, Inc., filed a stay request with the arbitrator. Mr. Coate requested a stay pending ruling on the unresolved mandate petitions and an expedited hearing on that subject.

On March 3, 2010, Kim Tommaselli, the alliance's senior counsel, wrote in an e-mail that Mr. Coate's February 23, 2010 arbitrator fee challenge would be processed. In her e-mail, Ms. Tommaselli requested a clarification as to what invoice was the subject of Mr. Coate's challenge. In response, Mr. Coate clarified he was concerned about the arbitrator's February 28, 2010 invoice which included the $15,000 advance payment order.

On March 4, 2010, Ms. Starkey wrote the arbitrator: "We have received your February 28, 2010 invoice which requires the parties in the above referenced matter to pay an additional fee deposit of $30,000. The amount requested far exceeds the customary deposits in [an alliance] arbitration. Given the exceptional amount requested, [the alliance] asks that you provide to all parties and to [the alliance] an explanation of the arbitrator's fees that this deposit is intended to cover. Based on the extraordinary amount of time already spent on this matter to date (221.5 hours) and the further deposit requested, the parties should also be made aware of the time that you expect to spend through the conclusion of the matter, including the hearing and issuance of a final award. [¶] If you have any questions, please let me know. Thank you in advance for your cooperation." Also on March 4, 2010, we summarily denied the petition of Mr. Howsam and Greenlight Film &

Television, Inc., directed at the trial court's order refusing to stay the arbitration. (*Greenlight Film & Television, Inc. v. Superior Court* (Mar. 4, 2010, B222450) [order].)

On March 5, 2010, Mr. Howsam and Greenlight Film & Television, Inc., served by mail objections to a deposition notice. The deposition notice required Mr. Howsam to appear on his own behalf and Greenlight Film & Television, Inc. The objections stated sections 2025.210 and 2025.230 do not apply to international depositions; the depositions were conducted in violation of Canadian law; the dates were unilaterally selected and were inconvenient; neither Mr. Howsam nor Greenlight Film & Television, Inc., would appear for the deposition on the scheduled dates; and video recording the deposition would be burdensome and harassing. Further, Mr. Howsam and Greenlight Film & Television, Inc., objected to three document categories in the deposition notice on the grounds they did not describe with particularity the papers to be produced; the request was not calculated to lead to the discovery of admissible evidence; and one category was premised on a falsehood. At that point, Mr. Howsam's deposition was scheduled for March 12 and 15, 2010, in Toronto.

On March 8, 2010, plaintiff's counsel objected to any further delay of Mr. Howsam's deposition: "[Plaintiff] wishes to remind the tribunal that its request for depositions was litigated and litigated again, and these depositions were ordered on November 20, 2009, originally scheduled for February 9–2 [*sic*] by this tribunal's January 14, 2010 order, and then rescheduled for the current March 12 and 15 dates by this tribunal's February 5, 2010 order (amended on February 8, 2010). In other words, there should be no further argument or dispute over these depositions. The interests of finality and judicial economy dictate that, if Mr. Howsam fails to appear, terminating sanctions should issue."

Also on March 8, 2010, the arbitrator reiterated his prior order concerning Mr. Howsam's deposition: "Previous orders with respect to the ordered and agreed scheduling of two days of depositions on March 12 and 15, 2010 are affirmed. In the even[t] that Mr. Howsam fails to appear for depositions as previously ordered and noticed, this tribunal will favorably consider an award of default and/or sanctions against [Mr.] Howsam and . . . Greenlight [Film & Television, Inc.]" The arbitrator agreed to hear defendants' objections to the proposed video recording of Mr. Howsam's deposition. On March 10, 2010, the arbitrator denied defendants' further stay motion which had been filed on March 2, 2010. On March 10, 2010, plaintiff's counsel responded to the fee challenge and copied the letter to the arbitrator.

On March 11, 2010, Mr. Howsam's counsel, Mr. Coate, wrote to the arbitrator: "[I]n view of the pending writ regarding terminating sanctions, or

in the alternative, for disqualification against [plaintiff] as well as the companion pending Petition for Review regarding the issuance of a stay under consideration before the California Supreme Court, and pursuant to objections timely served in accordance with the California Discovery Act, to avoid severe and unavoidable prejudice, cost and unnecessary expense, my clients will not and cannot attend these improperly noticed international video depositions which were unilaterally set to commence tomorrow in Toronto, Ontario, Canada." Also on March 11, 2010, our Supreme Court denied the review petition of Mr. Howsam and Greenlight Film & Television, Inc., which sought to stay the arbitration. (*Greenlight Film & Television, Inc. v. Superior Court* (Mar. 11, 2010, S180731) [order].)

On March 12, 2010, Mr. Howsam and Greenlight Film & Television, Inc., filed a disqualification request with the Arbitral Agent, Ms. Starkey. As noted, the Arbitral Agent was charged with the duty to decide disqualification issues. The challenge was based on the following allegations: the arbitrator's May 21, 2009 disclosure was untimely; there had been depositions, extensive document production, and use of interrogatories; admissions requests had been propounded; depositions had been ordered; this was the first time Mr. Coate, counsel for Mr. Howsam and Greenlight Film & Television, Inc., had seen their use in an international arbitration; the hearings had exclusively been held at plaintiff's counsel's offices; and numerous unspecified motions had not yet been ruled upon. Also, Mr. Coate raised an issue concerning allocation of fees. On March 12, 2010, we denied the mandate petition of Mr. Howsam and Greenlight Film & Television, Inc., challenging the trial court's ruling denying their sanctions and disqualification motions. (*Greenlight Film & Television, Inc. v. Superior Court* (Mar. 12, 2010, B222454) [order].) On March 15, 2010 defendants, other than Mr. Howsam and Greenlight Film & Television, Inc., filed a joinder in the March 12, 2010 disqualification request.

On March 15 and 19, 2010, plaintiff filed a sanctions motion. On March 16, 2010, Mr. Coate objected to any consideration being given plaintiff's sanctions motion while the disqualification issue remained unresolved. Mr. Coate wrote to Ms. Starkey and Ms. Tommaselli: "We are in receipt of recent pleadings accepted for filing by the arbitrator while there is a pending challenge before this tribunal regarding his ability to continue to serve as an arbitrator. We are also in receipt of a joinder to the challenge by other parties in this proceeding. We must object to continued participation in this proceeding by the arbitrator while the instant challenge is pending. For example, under [section] 170.4[, subdivision ](d) 'a disqualified judge shall have no power to act in any proceeding after his or her disqualification or after the filing of a statement of his or her disqualification has been determined.' Notwithstanding that this matter is an arbitration, Respondents cannot be required to waive their right to have this threshold matter first determined.

[¶] . . . Under the circumstances, please confirm that during this interim of the tribunal's determination on the pending challenge, the arbitrator will refrain [from] improper consideration of matters before a threshold determination on the challenge is made."

While the disqualification request was being processed, Ms. Starkey ruled on the fee dispute. On March 17, 2010, she wrote: "In response to your request for a retroactive reallocation of the arbitrator's fees previously paid, Arbitrator Strick's December 22, 2009 Order states that the arbitrator's fees shall be borne equally by Claimant and Respondents so that Claimant is responsible for 50 [percent] and Respondents, collectively, are responsible for 50 [percent] of the arbitrator's fees. The Order specifically states that such fee allocation become effective after all deposits have been depleted and that a final allocation of the fees will be done at the conclusion of the arbitration. [The alliance] does not have jurisdiction to overrule or supersede any Order of the Arbitrator. [The alliance's] Rule 3.6 states, '[p]rior to the appointment of the Arbitrator, the Arbitral Agent shall make such decisions regarding procedural matters as may be required from time to time under these Rules. *After the appointment of the Arbitrator, notices of all such matters shall be forwarded to the Arbitrator (with copy to the Arbitral Agent) for decision and the Arbitrator shall make such decision.*' ([E]mphasis added.) [¶] Based on a review of the [alliance's] file, several charges appear to be either duplicative or excessive based on the description of the work performed and the corresponding documents in the file for that time period. As such, the invoices dated January 13, 2010 and February 28, 2010 in the above-referenced arbitration shall collectively be reduced by 17.5 hours or Five Thousand Two Hundred Fifty Dollars ($5,250). Arbitrator Strick is directed to refund the parties their respective shares of such amount based upon the allocation of fees in effect at the time of the invoice. [Fn. omitted.] [¶] With regard to the $30,000 advance deposit requested from the parties, Arbitrator Strick explained in his March 5 letter that such amount was expected to cover the 12 hearing days in April. [¶] . . . The parties and the Arbitrator shall be bound by this decision with regard to this fee challenge pursuant to the [alliance's] Rules." The omitted footnote states, "The January 13 invoice is reduced by 11.25 hours ($3,375) and the February 28 invoice is reduced by 6.25 hours ($1,875)." Immediately thereafter, counsel for Mr. Howsam and Greenlight Film & Television, Inc., reiterated their objections to Mr. Strick remaining as the arbitrator.

On March 19, 2010, the arbitrator responded to Mr. Coate's March 12, 2010 disqualification request. The arbitrator explained that the alliance had initially divided the fees at 75 percent to defendants and 25 percent to plaintiff. The arbitrator noted he had modified the alliance's decision to require each side to pay 50 percent of the fees. The arbitrator agreed to immediately adjust the fee computation in compliance with Ms. Starkey's

March 17, 2010 determination. The arbitrator also stated he had fully considered the defendants' stay motions. As to the disclosure issue, the arbitrator stated: "At the time of my appointment, it did not occur to me that a client's bank account at [plaintiff], on which I was signatory was a proper subject of disclosure. After the lengthy stay of this arbitration following dismissal of Federal charges against Mr. Howsam were dismissed, I discussed disclosure on an anonymous basis with senior [alliance] advisors who confirmed their view that the matter was not subject to disclosure. Nevertheless in an abundance of caution, and even though I no longer represented the clients, I disclosed the matter to the parties on May 21, 2009. Neither side objected or otherwise raised concerns to the matters contained in the disclosure until the current Challenge, which did not occur within the period prescribed to assert a challenge under [alliance] Rule 6.6.1." (Fn. omitted.) In terms of the depositions, the arbitrator stated they were ordered upon the parties' agreement at a January 27, 2010 hearing. The parties filed further papers in response to the challenge and the arbitrator's March 19, 2010 written analysis of the disqualification issue.

On March 24, 2010, Mr. Howsam and Greenlight Film & Television, Inc., filed a supplemental challenge to the arbitrator. Mr. Howsam and Greenlight Film & Television, Inc., cited to the aforementioned reference to "clients" in the arbitrator's March 19, 2010 letter. On March 30 and April 5, 2010, Ms. Starkey denied defendants' challenges to the arbitrator.

On March 30, 2010, Ms. Starkey, in her role as the Arbitral Agent, issued a three-page single-spaced decision refusing to disqualify Mr. Strick as the arbitrator. On April 1, 2010, the arbitrator declared defendants in default pursuant to the alliance's arbitration rule 11.1 for failure to pay arbitral fees. On April 5, 2010, Ms. Starkey indicated the alliance's decision on the billing challenge was final. The arbitration hearing was scheduled for April 12, 2010. Shortly before April 12, 2010, defendants announced they were withdrawing from the arbitral proceedings. When defendants withdrew, there was a pending terminating sanctions motion directed against them for their failure to obey the arbitrator's discovery orders.

### D. Events Occurring After Defendants Withdrew from the Arbitration

On April 12, 2010, plaintiff presented its evidence in a default hearing. On April 13, 2010, Mr. Howsam and Greenlight Film & Television, Inc., filed a motion in the trial court for an order disqualifying the arbitrator. Such a motion filed in the trial court is permitted in international commercial arbitrations by section 1297.134, a subject which shall be discussed later.

On May 3, 2010, the arbitrator entered an interim award and factual findings in plaintiff's favor on all its contract claims. The arbitrator found plaintiff entered into loan and security agreements with defendants, except for Mr. Howsam and Greenlight Film & Television, Inc.; Mr. Howsam created the seven corporations as vehicles for production of an equal number of films; Mr. Howsam signed the loan agreements on behalf of the seven corporations; and the agreements were designed to provide production loans for the seven films. The collateral for the seven loans consisted of what the arbitrator termed "pre-sales" documents. The arbitrator described the pre-sales documents and their purpose: "Pre-sales are used to demonstrate (1) the level of interest in a proposed film; (2) film industry confidence in the producer[;] and (3) distributors' commitments to purchase rights to a film once it is distributed." The pre-sales documents consisted of executed distribution agreements, "deal memos," and assignment notices for the seven films. The security agreements in this case included provisions in which the borrowers represented the pre-sales for each film was accurate; the borrowers assigned their rights to distributor payments so as to satisfy the loan indebtedness; and the borrowers acknowledged the loans would not have been made without the representations contained in the pre-sales papers. The distribution agreements were forged. The forged distribution agreements were submitted to plaintiff prior to the funding of the loans by Mr. Howsam and Greenlight Film & Television, Inc. Plaintiff discovered the fraud when it later directly contacted the film distributors.

Also, on May 3, 2010, the arbitrator found in plaintiff's favor on its fraud-based claims. The arbitrator found: the forged distribution agreements were given to plaintiff to induce funding of the loans; two foreign distributors testified they never entered into the distribution agreements; other declarations established the distribution agreement signatures were forged; plaintiff would not have funded the loans had its employees knew of *any* of the forgeries; the forged instruments were provided by Mr. Howsam; and Mr. Howsam knew the instruments were forged. According to the arbitrator, Mr. Howsam complimented Mr. Goldstein for one of the forgeries, referring to it as " 'creative thinking' "; directed Mr. Goldstein and an assistant to forge signatures on other distribution agreements; personally participated in one of the forgeries; during a video secured by the Federal Bureau of Investigation, admitted he knew of the forgeries; during the video told Mr. Goldstein to claim a subordinate forged the signatures and to lie about the scheme; destroyed evidence of the fraud as to one of the films and shredded his own files; paid Mr. Goldstein's living expenses and attorney fees once plaintiff discovered the fraud; made the payments in an effort to "buy" Mr. Goldstein's silence; also paid the attorney fees for a witness, Michelle Glockler; the video states Ms. Glockler's fees were paid to "keep her quiet"; told Mr. Goldstein to "stay

quiet and develop 'amnesia[]' "; told Mr. Goldstein to shred documents; and transferred his assets to his wife's name after plaintiff discovered the fraudulent scheme.

Further, on May 3, 2010, the arbitrator found the seven corporations which received loan proceeds were the alter egos of Mr. Howsam and Greenlight Film & Television, Inc. The arbitrator found Mr. Howsam created and controlled CPC Communications, Inc.; Greenlight Film & Television, Inc., is a wholly owned subsidiary of CPC Communications, Inc.; Mr. Howsam is the sole director of Greenlight Film & Television, Inc.; CPC Communications, Inc., is the sole shareholder of Greenlight Film & Television, Inc.; all seven corporations used to fund the films are wholly owned subsidiaries of Greenlight Film & Television, Inc.; Mr. Howsam transferred assets of these corporations and created a new entity; the new entity received profitable assets from other defendants; money from defendants' corporate accounts was paid to Mr. Goldstein's spouse in order that he remain silent about the forgeries; Greenlight Film & Television, Inc., and the seven corporations which received the loans were never adequately capitalized; Mr. Howsam used the forged instruments to secure funding for films; the funds were used interchangeably by all of the subsidiaries; and Mr. Howsam used the loan proceeds for matters unrelated to film production. Finally, the arbitrator found defendants acted with malice, fraud and oppression. The arbitrator awarded compensatory damages in plaintiff's favor against all defendants in the sum of $18,204,236 plus interest from April 7, 2010, awarded plaintiff costs and attorney fees, and denied defendants' cross-claims.

On May 12, 2010, our Supreme Court denied the review petition of Mr. Howsam and Greenlight Film & Television, Inc. The review petition challenged the trial court's order denying their terminating sanctions and disqualification motion. (*Greenlight Film & Television, Inc. v. Superior Court* (May 12, 2010, S181113) [order].) On May 25, 2010, the trial court denied the motion of Mr. Howsam and Greenlight Film & Television, Inc., to disqualify the arbitrator. As noted, the disqualification motion of Mr. Howsam and Greenlight Film & Television, Inc., had been filed on April 13, 2010, before the arbitrator began hearing testimony. No defendant filed a mandate petition challenging the trial court's May 25, 2010 order refusing to disqualify the arbitrator.

On July 16, 2010, the arbitrator granted plaintiff's sanctions motions which had been filed on March 15 and 19, 2010. The arbitrator found he had the authority to impose monetary sanctions. The arbitrator found that Mr. Coate had "engaged in abusive discovery practices" by belatedly notifying plaintiff's attorneys that Mr. Howsam would refuse to attend his deposition; this caused plaintiff's counsel to unnecessarily travel to Toronto; and by disingenuously objecting to the videotaping of the deposition which implied

Mr. Howsam would be deposed. The arbitrator imposed $10,598.42 in monetary sanctions against Mr. Howsam and Greenlight Film & Television, Inc., and their counsel, Mr. Coate. Plaintiff had sought a monetary sanctions award against A. Raymond Hamrick, the attorney for the seven corporations used to secure the loan funding. The arbitrator found Mr. Hamrick had not engaged in any discovery abuses. On July 19, 2010, the arbitrator imposed $1,641,367.17 in costs against defendants as follows: fees and costs in the sum of $1,500,794.50; $34,587.50 in arbitrator fees; and $105,985.17 in sanctions. All awards were certified pursuant to article I of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958. Commonly referred to as the "New York Convention," it is codified in this country at title 9 United States Code sections 201 through 208.

### E. Events Occurring After the Awards Are Returned

On August 20, 2010, defendants filed petitions to vacate the arbitration awards. The petitions are based on all the grounds specified in section 1286.2, subdivision (a). In addition, the petitions and points and authorities allege the arbitrator engaged in misconduct because he failed to make timely mandatory disclosures, rendered a duplicative billing, refused to rule on defendants' motions and issued an inappropriate award; the award is executed by "Stephen J. Strick" who was unknown to defendants; the award was obtained through undue means; the arbitrator improperly refused to stay the arbitration; there were errors in connection with alter ego and discovery issues; the arbitrator failed to resolve all necessary issues; and the award was returned in manifest disregard of the law. Defendants did not request a new arbitration hearing. Plaintiffs filed an opposition.

On December 22, 2010, the trial court denied the petitions to vacate the awards. The awards were confirmed. Defendants' motions for issuance of a statement of decision were denied. On January 5, 2011, notice of entry of the two orders confirming the awards and denying the motion to vacate them was served. Judgment was entered on March 2, 2011. Notice of entry of judgment was served on March 8, 2011. Notices of appeal were filed on behalf of defendants and Mr. Coate on April 26, 2011.

### IV. DISCUSSION

### A. Vacatur

Defendants argue the award should be vacated on various grounds. The case was litigated in the trial court on the assumption California's vacatur provisions applied to this dispute. The briefs are all premised on the

assumption that this state's vacatur provisions are applicable. At oral argument, in response to an inquiry from the bench, every attorney stipulated the arbitration confirmation and vacatur provisions of the California Arbitration Act apply.

 An award may be vacated on the grounds specified in section 1286.2, subdivision (a).[6] (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 33 [10 Cal.Rptr.2d 183, 832 P.2d 899] ["[A]n award reached by an arbitrator pursuant to a contractual agreement to arbitrate is not subject to judicial review except on the grounds set forth in sections 1286.2 (to vacate) and 1286.6 (for correction)."]; *Oaktree Capital Management, L.P. v. Bernard* (2010) 182 Cal.App.4th 60, 68 [106 Cal.Rptr.3d 16] ["[G]rounds for vacating an arbitrator's award are statutory and limited."].) In addition, an award may be vacated where an arbitrator commits clear legal error which denies a litigant a hearing on an unwaivable important statutory right. (*Pearson Dental Supplies, Inc. v. Superior Court* (2010) 48 Cal.4th 665, 669–670, 675–680 [108 Cal.Rptr.3d 171, 229 P.3d 83]; see *Shahinian v. Cedars-Sinai Medical Center* (2011) 194 Cal.App.4th 987, 1004, fn. 14 [124 Cal.Rptr.3d 128].)

## B. Failure to Disclose

### 1. Background

Defendants argue the awards must be vacated because the arbitrator failed to timely disclose a basis for disqualification. Defendants rely on the following facts: the arbitrator was assigned on November 12, 2007; on May 21, 2009, the arbitrator disclosed that he had represented a client who had an account with plaintiff; he had signatory authority over the account; and on March 19, 2010, while responding to their for-cause challenge, the arbitrator referred to "clients." As noted, on March 12, 2010, Mr. Howsam and Greenlight

---

[6] Section 1286.2 states: "(a) Subject to Section 1286.4, the court shall vacate the award if the court determines any of the following: [¶] (1) The award was procured by corruption, fraud or other undue means. [¶] (2) There was corruption in any of the arbitrators. [¶] (3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator. [¶] (4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted. [¶] (5) The rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions of this title. [¶] (6) An arbitrator making the award either: (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware; or (B) was subject to disqualification upon grounds specified in Section 1281.91 but failed upon receipt of timely demand to disqualify himself or herself as required by that provision. However, this subdivision does not apply to arbitration proceedings conducted under a collective bargaining agreement between employers and employees or between their respective representatives. . . ."

Film & Television, Inc., filed a disqualification motion. The challenge was based in part on the arbitrator's failure to disclose his signatory authority over a client's account maintained with plaintiff. On March 15, 2010, the other defendants joined in the disqualification request of Mr. Howsam and Greenlight Film & Television, Inc.

In response to the March 12 and 15, 2010 challenges, the arbitrator referred to a discussion with alliance officials concerning his "clients" and the duty to disclose. The reference to clients was made in the arbitrator's March 19, 2010 response to defendants' challenges. On March 24, 2010, Mr. Howsam and Greenlight Film & Television, Inc., filed a supplemental challenge premised on the arbitrator's March 19, 2010 reference to "clients" in his response to defendants' challenges. Defendants' challenges to the arbitrator were denied by Ms. Starkey on March 30, 2010. On April 13, 2010, Mr. Howsam and Greenlight Film & Television, Inc., filed a motion in the trial court for an order disqualifying the arbitrator. On May 25, 2010, the trial court denied the motion of Mr. Howsam and Greenlight Film & Television, Inc., to disqualify the arbitrator.

■ Defendants rely on section 1286.2, subdivision (a)(6)(A) and (B) which, as we have noted, states: "(a) Subject to Section 1286.4, the court shall vacate the award if the court determines any of the following: [¶] . . . [¶] (6) An arbitrator making the award either: (A) failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware; or (B) was subject to disqualification upon grounds specified in Section 1281.91 but failed upon receipt of timely demand to disqualify himself or herself as required by that provision. However, this subdivision does not apply to arbitration proceedings conducted under a collective bargaining agreement between employers and employees or between their respective representatives." Section 1281.9, subdivision (a) identifies a specific circumstance where an arbitrator has a duty to disclose: "In any arbitration pursuant to an arbitration agreement, when a person is to serve as a neutral arbitrator, the proposed neutral arbitrator shall disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial, including all of the following: [¶] (1) The existence of any ground specified in Section 170.1 for disqualification of a judge." One of the grounds for disqualification of a judge is if a person aware of the facts might reasonably entertain a doubt whether the jurist would be able to be impartial. (§ 170.1, subd. (a)(6)(A)(iii); *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 388–389 [112 Cal.Rptr.3d 853, 235 P.3d 152]; *Rebmann v. Rohde* (2011) 196 Cal.App.4th 1283, 1291 [127 Cal.Rptr.3d 510].) Defendants assert the arbitrator's failure to disclose his signatory authority over an account maintained by a client (or clients) with plaintiff required his disqualification. As there are no disputed facts, we

review this contention de novo. (*Haworth v. Superior Court, supra*, 50 Cal.4th at p. 385; *Rebmann v. Rohde, supra*, 196 Cal.App.4th at p. 1290.)

The present case involves an international commercial arbitration. We conclude these contentions do not provide a basis for reversal on direct appeal from a judgment following confirmation of an international commercial arbitration award. As we will explain, the disclosure duties and the consequences of a failure to disclose differ in domestic and international commercial arbitrations. As a result, the failure to comply with sections 1281.9 and 1281.91's disclosure obligations are not grounds for vacatur of an international commercial arbitration award. Given our holding, we need not address the parties' contentions regarding the arbitrator's alleged duty to disclose his signatory power over a client's (or clients') bank accounts.

### 2. Disclosure duties under California's international commercial arbitral law

An arbitrator's disclosure duties under California's international commercial arbitration statutes materially depart from those applicable to domestic disputes. Section 1297.17 states in part, "[T]his title supersedes Sections 1280 to 1284.2, inclusive, with respect to international commercial arbitration and conciliation." As will be noted, the import of section 1297.17 is to abrogate the arbitrator disclosure duties under sections 1281.9 and 1281.91. Further, no court may intervene in matters governed by the international commercial arbitration statutes except as specified therein. Section 1297.51 states, "In matters governed by this title, no court shall intervene except where so provided in this title, or applicable federal law."

Sections 1297.121 through 1297.125 impose disclosure requirements on arbitrators in international commercial arbitrations, some of which materially deviate from those in sections 1281.9 and 1281.91. Section 1297.121 describes an international arbitrator's disclosure duties: "[A]ll persons whose names have been submitted for consideration for appointment or designation as arbitrators or conciliators, or who have been appointed or designated as such, shall, within 15 days, make a disclosure to the parties of any information which might cause their impartiality to be questioned including, but not limited to, any of the following instances . . . ."[7] The foregoing disclosure

---

[7] Section 1297.121 provides in its entirety: "Except as otherwise provided in this title, all persons whose names have been submitted for consideration for appointment or designation as arbitrators or conciliators, or who have been appointed or designated as such, shall, within 15 days, make a disclosure to the parties of any information which might cause their impartiality to be questioned including, but not limited to, any of the following instances: [¶] (a) The person has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. [¶] (b) The person served as a lawyer in the

duty is mandatory. (§ 1297.121.) The duty to disclose is continuing, "From the time of appointment and throughout the arbitral proceedings, an arbitrator, shall, without delay, disclose to the parties any circumstances referred to in Section 1297.121 which were not previously disclosed." (§ 1297.123.)

■ Section 1297.132 requires a challenge be made within 15 days of becoming aware of the disqualifying circumstances.[8] The arbitral tribunal, in this case the alliance, then decides whether to disqualify the arbitrator. If a challenge is unsuccessful, the matter may be taken to superior court. Section 1297.134 states: "If a challenge following the procedure under Section 1297.133 is not successful, the challenging party may request the superior court, within 30 days after having received notice of the decision rejecting the challenge, to decide on the challenge. If a challenge is based upon the grounds set forth in Section 1297.121, and the superior court determines that the facts support a finding that such ground or grounds fairly exist, then the challenge should be sustained." Once the challenge has been ruled upon by the superior court, the decision is final and not subject to appeal. Section 1297.135 provides, "The decision of the superior court under Section 1297.134 is final and is not subject to appeal."

---

matter in controversy, or the person is or has been associated with another who has participated in the matter during such association, or he or she has been a material witness concerning it. [¶] (c) The person served as an arbitrator or conciliator in another proceeding involving one or more of the parties to the proceeding. [¶] (d) The person, individually or a fiduciary, or such person's spouse or minor child residing in such person's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding. [¶] (e) The person, his or her spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person meets any of the following conditions: [¶] (i) The person is or has been a party to the proceeding, or an officer, director, or trustee of a party. [¶] (ii) The person is acting or has acted as a lawyer in the proceeding. [¶] (iii) The person is known to have an interest that could be substantially affected by the outcome of the proceeding. [¶] (iv) The person is likely to be a material witness in the proceeding. [¶] (f) The person has a close personal or professional relationship with a person who meets any of the following conditions: [¶] (i) The person is or has been a party to the proceeding, or an officer, director, or trustee of a party. [¶] (ii) The person is acting or has acted as a lawyer or representative in the proceeding. [¶] (iii) The person is or expects to be nominated as an arbitrator or conciliator in the proceedings. [¶] (iv) The person is known to have an interest that could be substantially affected by the outcome of the proceeding. [¶] (v) The person is likely to be a material witness in the proceeding."

[8] Section 1297.132 states, "Failing any agreement referred to in Section 1297.131, a party which intends to challenge an arbitrator shall, within 15 days after becoming aware of the constitution of the arbitral tribunal or after becoming aware of any circumstances referred to in Sections 1297.124 and 1297.125, whichever shall be later, send a written statement of the reasons for the challenge to the arbitral tribunal."

### 3. Analysis

#### a. Appealability

Plaintiff argues defendants' failure to disclose contention cannot be raised on direct appeal from the judgment following an order confirming the three arbitration awards. As noted, section 1297.135 expressly states the superior court's determination is not subject to appeal. There are two other provisions of California's international commercial arbitration statutes which state the superior court's decision is final and not subject to appeal. (§§ 1297.117 [review of disputes over arbitrator selection], 1297.143 [review of disputes over an arbitrator's failure to act].)

■ The right to appeal is statutory subject to the constitutional right of review by an appellate court. Our Supreme Court has repeatedly stated the right to appeal is statutory. (*People v. Mena* (2012) 54 Cal.4th 146, 152 [141 Cal.Rptr.3d 469, 277 P.3d 160]; *Dana Point Safe Harbor Collective v. Superior Court* (2010) 51 Cal.4th 1, 5 [118 Cal.Rptr.3d 571, 243 P.3d 575].) However, the abrogation of the right to appeal must be clearly stated: " '[W]e have repeatedly held that if the Legislature intends to abrogate the statutory right to appeal, that intent must be clearly stated. "The right of appeal is remedial and in doubtful cases the doubt should be resolved in favor of the right whenever the substantial interests of a party are affected by a judgment . . . ." [Citations.]' (*In re Matthew C.* [(1993)] 6 Cal.4th [386,] 394 [24 Cal.Rptr.2d 765, 862 P.2d 765].)" (*In re S.B.* (2009) 46 Cal.4th 529, 537 [94 Cal.Rptr.3d 24, 207 P.3d 525].)

■ In *Matthew C.*, our Supreme Court reviewed language in Welfare and Institutions Code former section 366.26, subdivision (k) which purported to restrict the right to postjudgment appellate review. The order at issue was one setting a parental termination rights hearing. Welfare and Institutions Code former section 366.26, subdivision (k) stated, "An order by the court directing that a hearing pursuant to this section be held is not an appealable order, but may be the subject of review by extraordinary writ." (Stats. 1991, ch. 820, § 5, pp. 3648, 3652.) Our Supreme Court analyzed whether this language barred raising the appropriateness of an order setting a parental termination rights hearing in a postjudgment appeal: "The phrase, 'not an appealable order,' has long been applied to interlocutory orders that are not *immediately appealable*, but are subject to review on appeal from a subsequent final judgment. 'Generally speaking, under the one final judgment rule, interlocutory or interim orders are not appealable, but are only "reviewable on appeal" from the final judgment.' (*Rao v. Campo* (1991) 233 Cal.App.3d 1557, 1565 [285 Cal.Rptr. 691]; see *Southern Pacific Co. v. Oppenheimer* (1960) 54 Cal.2d 784, 785–786 [8 Cal.Rptr. 657, 356 P.2d 441].) ' "The theory behind

the rule is that piecemeal disposition and multiple appeals in a single action are oppressive and costly, and review of intermediate rulings should await the final disposition of the case." ' (*Rao* v. *Campo, supra,* 233 Cal.App.3d at p. 1565.) If an order is appealable, however, and no timely appeal is taken therefrom, the issues determined by the order are res judicata. (See, e.g., *Reeves* v. *Hutson* (1956) 144 Cal.App.2d 445, 451 [301 P.2d 264].)" (*In re Matthew C., supra,* 6 Cal.4th at p. 393, fn. omitted.) Turning to other authority, our Supreme Court held: "In numerous cases, this court and the Courts of Appeal have used the phrase 'not an appealable order' to characterize an order as being merely interim or interlocutory. [Citations.] Thus, to construe such language as forever precluding review on appeal from a final judgment would be a dramatic and wholly unwarranted departure from long-standing precedent." (*Id.* at pp. 393–394.)

■ Here, the Legislature never clearly stated an intent to abrogate the right to appeal a judgment entered *after* an international commercial arbitration award was confirmed. Certainly, section 1297.17 speaks to superseding sections 1280 through 1284.2. And section 1297.51 limits judicial intervention to circumstances specified in the international arbitration rules. But no international commercial arbitration statutory provision discusses postconfirmation awards. By contrast section 904.1, subdivision (a)(1) provides a litigant may appeal from a judgment.[9] We have carefully reviewed the committee reports and numerous letters and memoranda before the Legislature before sections 1297.11 through 1297.337 were adopted in 1988. None of them even address the right to appeal under section 904.1, subdivision (a)(1). More to the point, no international commercial arbitration provision prevents raising a disqualification issue in a postjudgment appeal. Certainly, a superior court order addressing a disqualification may not be immediately appealed. (§ 1297.135.) But a disqualification issue can be litigated in a postjudgment appeal as defendants have done here. Therefore, we disagree with plaintiff's argument that the disclosure issue cannot be raised on direct appeal. As will be noted though, that does not resolve the question of whether the awards can be set aside under section 1286.2, subdivision (a)(6)(A).

### b. Applicable disclosure provisions

As noted, in 1988, the Legislature expressly stated international commercial arbitrations were not subject to sections 1280 to 1284.2. (§ 1297.17.) Sections 1281.9 and 1281.91 are part of the superseded domestic arbitration provisions. Section 1281.91, and by reference section 1281.9, are relevant

---

[9] Section 904.1, subdivision (a) states: "An appeal, other than in a limited civil case, is to the court of appeal. An appeal, other than in a limited civil case, may be taken from any of the following: [¶] (1) From a judgment . . . ."

because they are referred to in the section 1286.2, subdivision (a)(6) vacatur provision. But section 1281.9 was enacted in 1994 after the international commercial arbitration provisions were adopted in 1988. (Stats. 1994, ch. 1202, § 1, pp. 7420–7421.) Further, section 1281.9 was enacted in 2001, well after the international commercial arbitration statutes were adopted. (Stats. 2001, ch. 362, § 5, p. 3491.) We have examined the committee reports prepared in connection with the 2001 statutes when section 1281.9 was amended and section 1281.91 was adopted. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.) as amended Apr. 16, 2001; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.) as amended Apr. 16, 2001; Assem. Com. on Appropriations, Analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.) as amended Aug. 27, 2001; Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business, Analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.) as amended Aug. 27, 2001; and Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business, Analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.) as amended Aug. 27, 2001.) We have further examined the committee reports prepared in 1994 when section 1281.9 was adopted. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1638 (1993–1994 Reg. Sess.) May 10, 1994; Sen. Com. on Judiciary, Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1638 (1993–1994 Reg. Sess.) May 27, 1994; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1638 (1993–1994 Reg. Sess.) as amended July 1, 1994; Sen. Com. on Judiciary, 3d reading analysis of Sen. Bill No. 1638 (1993–1994 Reg. Sess.) as amended Aug. 9, 1994; Sen. Com. on Judiciary, 3d reading analysis of Sen. Bill No. 1638 (1993–1994 Reg. Sess.) as amended Aug. 16, 1994; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1638 (1993–1994 Reg. Sess.) Aug. 26, 1994; and Sen. Com. on Judiciary, 3d reading analysis of Sen. Bill No. 1638 (1993–1994 Reg. Sess.) as amended Aug. 26, 1994.) They never discuss international commercial arbitrations. Complicating matters though, section 1286.2, subdivision (a)(6), which relates to vacating an award, directly refers to section 1281.91.

We believe that sections 1281.9 and 1281.91, which are expressly superseded by section 1297.17, do not apply to international commercial arbitrations for the following reasons. To begin with, they are *expressly* superseded. And section 1297.121 sets forth the mandatory arbitrator disclosures in international commercial arbitrations. (See fn. 7, *ante.*) Section 1281.9 identifies similar but also materially different disclosure duties. Among the different disclosure duties listed in section 1281.9 are current or prospective employment arrangements with a party, discussions with a party concerning possible employment, matters specified in the California Rules of Court, Ethics Standards for Neutral Arbitrators in Contractual Arbitration, names of all parties to prior noncollective bargaining cases in which the arbitrator has served, cases where the arbitrator is a party arbitrator, and the results of

arbitrations within a five-year period. Disclosure of enumerated factors in the case of an international commercial arbitration must be made within 15 days of the arbitrator's assignment. (§ 1297.121.) Disclosure in domestic arbitrations must be made within 10 calendar days of the assignment of the arbitrator. (§ 1281.9, subd. (b).) There is an overlap between sections 1281.9 and 1281.91, on one hand, and section 1297.121, on the other, but the differences are material. Section 1297.121 is the more specific of the two statutory schemes because it applies to international commercial arbitrations. Since it is the more specific statute, section 1297.121 is the controlling disclosure statute in international commercial arbitrations, not sections 1281.9 and 1281.91. ▮ (*Lake v. Reed* (1997) 16 Cal.4th 448, 464 [65 Cal.Rptr.2d 860, 940 P.2d 311] ["a more specific statute controls over a more general one"]; *Prudential Reinsurance Co. v. Superior Court* (1992) 3 Cal.4th 1118, 1148 [14 Cal.Rptr.2d 749, 842 P.2d 48] ["This violates the fundamental principle that where there is a conflict the more specific statute controls over the more general."].) This is particularly persuasive given the absence of any evidence the Legislature intended the 1994 and 2001 enactments to apply to international commercial arbitrations.

### c. Vacatur grounds

▮ Apart from cases like *Pearson Dental Supplies, Inc. v. Superior Court, supra*, 48 Cal.4th at pages 665, 669–670 and 675–680, the vacatur grounds listed in section 1286.2, subdivision (a) are controlling. (*Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at p. 33; *Oaktree Capital Management, L.P. v. Bernard, supra*, 182 Cal.App.4th at p. 68.) The failure to disclose a section 1297.121 disqualifying ground is not listed as a basis for a section 1286.2, subdivision (a)(6) vacatur order. Thus, the trial court correctly refused to vacate the award because of an alleged violation of section 1297.121. This does not mean an errant trial court ruling on a disqualification issue in an international commercial arbitration is immune from appellate review. A litigant remains free to raise the failure to disclose issue in a writ petition. All we are holding is that noncompliance with section 1297.121 is not a proper ground for a postaward judicial vacatur order under section 1286.2, subdivision (a)(6).

### C. Corruption, Fraud or Other Undue Means

### 1. Overview

Defendants argue that the award was secured through corruption, fraud or other undue means. They argue that there were ex parte communications between the arbitrator and unidentified alliance officials; the arbitrator threatened to default defendants if they failed to pay his fees in advance; the

arbitrator overbilled; the arbitrator received a letter from plaintiff's counsel during the fee challenge; the award was prepared by plaintiff; and the default award misspelled the arbitrator's name. In the published portion of the opinion we will discuss the ex parte communication, the arbitrator's order to pay fees and the overbilling issues.

Section 1286.2, subdivision (a)(1) states that an award may be vacated if the award is secured by corruption, fraud or other undue means. Fraud, as that term is used in section 1286.2, subdivision (a)(1), is that perpetrated by the arbitrator or a party. Only extrinsic fraud which denies a party a fair hearing may serve as a basis for vacating an award. (*Maaso v. Signer* (2012) 203 Cal.App.4th 362, 371–372 [136 Cal.Rptr.3d 853]; *Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 813, 827 [5 Cal.Rptr.3d 442]; *Pacific Crown Distributors v. Brotherhood of Teamsters* (1986) 183 Cal.App.3d 1138, 1147, fn. 5 [228 Cal.Rptr. 645].) As to undue means, a Ninth Circuit panel has defined the term thusly: "Although the term has not been defined in any federal case of which we are aware, it clearly connotes behavior that is immoral if not illegal. *See* Black's Law Dictionary 1697 (Rev. 4th ed. 1968) ('Undue' means 'more than necessary; not proper; illegal,' and 'denotes something wrong, according to the standard of morals which the law enforces.' 'Undue influence' means any 'improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered.')." (*A.G. Edwards & Sons, Inc. v. McCollough* (9th Cir. 1992) 967 F.2d 1401, 1403–1404; accord, *Pour Le Bebe, Inc. v. Guess? Inc., supra*, 112 Cal.App.4th at p. 831.) Undue means can include representation of a party where an attorney is operating under a conflict of interest. (*Pour Le Bebe, Inc.*, at pp. 813, 825–833.) Undue influence occurs when there is bribery or intimidation of the arbitrator. (*Id.* at p. 832.)

Improper ex parte communications between an arbitrator and a litigant can serve as a basis for a corruption, fraud or other undue means finding. (*Maaso v. Signer, supra*, 203 Cal.App.4th at pp. 373–375.) In the case of an ex parte communication between an arbitrator and an attorney, our colleagues in Division Six of this appellate district described why it was inappropriate to vacate the arbitration award: "We agree the arbitrator should have advised appellants' counsel of the ex parte communication and that he would be issuing an amended arbitration award resolving the stop notice claim. In the absence of a showing that the arbitrator was improperly influenced or actually considered evidence outside the original arbitration proceedings such that appellants needed a further opportunity to be heard on the stop notice claim, appellants cannot demonstrate that the amended award was procured by corruption, fraud, undue means, or misconduct of the arbitrator within the meaning of section 1286.2, subdivisions (a), (b) or (c)." (*A.M. Classic Construction, Inc. v. Tri-Build Development Co.* (1999) 70 Cal.App.4th 1470, 1476 [83 Cal.Rptr.2d 449].)

Defendants have the burden of showing the arbitrator committed error. (*Frantz v. Inter-Insurance Exchange* (1964) 229 Cal.App.2d 269, 274 [40 Cal.Rptr. 218]; *Popcorn Equipment Co. v. Page* (1949) 92 Cal.App.2d 448, 451 [207 P.2d 647], overruled on a different point in *Flores v. Arroyo* (1961) 56 Cal.2d 492, 497 [15 Cal.Rptr. 87, 364 P.2d 263].) Defendants must show they were prejudiced by the alleged corruption, fraud or undue means. (*Pacific Vegetable Oil Corp. v. C. S. T., Ltd.* (1946) 29 Cal.2d 228, 240 [174 P.2d 441] ["In order that the claimed departure from the usual procedure be held to amount to misconduct of the arbitrators sufficient to vacate the award it must be shown that such departure had prejudiced the rights of the buyer."]; *Manson v. Wilcox* (1903) 140 Cal. 206, 208–209 [73 P. 1004] ["The obvious meaning of this subdivision is . . . that the misconduct or error complained of, to whatever class it may belong, must be of such a character that the rights of the party complaining were prejudiced thereby."]; *Cothron v. Interinsurance Exchange* (1980) 103 Cal.App.3d 853, 860–861 [163 Cal.Rptr. 240] ["Absent a showing of prejudice, even if error had been committed, the lower court was required to affirm the award."]; *Davey Tree Surgery Co. v. International Brotherhood of Electrical Workers* (1976) 65 Cal.App.3d 440, 450 [135 Cal.Rptr. 300] ["an award will not be vacated for any error that does not prejudice the rights of the party complaining"]; see *Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at p. 37; Recommendation and Study Relating to Arbitration, (Dec. 1960) 3 Cal. Law Revision Com. Rep. (1961) p. G-55.) Dictum in one case arising from an international arbitral dispute states a party who refuses to participate in a contractual arbitration is foreclosed from challenging an award. (*A/S Ganger Rolf v. Zeeland Transportation, Ltd.* (S.D.N.Y. 1961) 191 F.Supp. 359, 363 ["It may not complain that it has not been heard on the merits before the arbitrators since it waived the right to do so granted to it by the arbitration agreement by which it bound itself."].)

None of the asserted grounds are a basis for vacating the award. Before proceeding to an analysis of the individual contentions, we note defendants withdrew from the arbitration. The sole record provided by defendants of the arbitration itself were the arbitrator's findings issued after the default hearing. That record reflects Mr. Howsam and Mr. Goldstein engaged in a sophisticated fraudulent conspiracy utilizing forged assignment notices and other documents to steal millions of dollars from plaintiff. Defendants have presented no evidence which would support an inference they do not owe the money. Defendants have failed to show that any of the claimed errors prejudiced them as they withdrew from the arbitral proceedings.

## 2. Ex parte communications with the arbitrator provider

Defendants assert the ex parte communication between the alliance officials and the arbitrator on the disclosure issue constitutes corruption, fraud or other undue means. As noted, the arbitrator discussed that he had signatory authority over a client's account with unidentified alliance officials. During that discussion, the arbitrator verified there was no disclosure duty concerning the account. Defendants' contention has no merit. No improper ex parte communication occurred between Ms. Starkey and the arbitrator. No decisional authority holds that counsel must be present when an arbitrator communicates with an arbitration administrator. And the communication was perfectly legitimate. The arbitrator wanted to verify if, under the alliance rules, he had to disclose the fact he had signatory authority over a client's account. The signatory authority issue was of little moment. The arbitrator had *no* financial interest in plaintiff. The arbitrator disclosed his signatory authority on May 21, 2009. Defendants waited until March 12 and 15, 2010, to raise the issue and only then when the arbitrator had made adverse rulings against them. The ex parte communication was not a basis for vacatur. (*A.M. Classic Construction, Inc. v. Tri-Build Development Co., supra*, 70 Cal.App.4th at p. 1476.)

## 3. The requirement that fees be posted in advance of the arbitral hearing on the merits

Defendants argue the arbitrator's threat to enter their default if they failed to pay his fees in advance requires vacatur. The alliance's rules expressly provide for this scenario. The alliance's rule 14.3 provides: "At any time after the commencement of the arbitration process, the Arbitral Agent or the Arbitrator shall have the right to require each party to deposit with the Arbitral Agent or the Arbitrator an equal amount as an advance against the Arbitrator's fees. The Arbitrator shall give formal notice of any such failure to meet the deposit requirements and the consequences of such failure. The failure of any party to meet the deposit requirements may be deemed by the Arbitrator to be a default under Rule [11.1] above, unless otherwise provided by applicable law. The Arbitrator may direct the other party or parties to pay the outstanding amounts to allow the arbitration to proceed (subject to any award on costs). If such payment is not made by claimant(s), the Arbitrator may dismiss the proceedings without prejudice. The Arbitrator may dismiss a claim or counterclaim, without prejudice, if a party fails to timely provide the full amount." Rule 11.1 of the alliance's international arbitration rules states: "If, after proper notice, one of the parties fails to respond to any demand by the Arbitrator for documents or other materials . . . or in any manner fails to conform to the provisions of these Rules or any order of the Arbitrator, the Arbitrator may declare that party to be in default

and make appropriate orders or interim awards to require compliance or may make a final award . . . . However, no default shall be found after the matter has been submitted for decision solely because of a party's failure to pay the Arbitrator's fees." Thus, the alliance's rules permit the arbitrator to order advance payment of fees and enter a default if they are unpaid. The award was not secured by corruption, fraud or other undue means because a potential default was authorized by the alliance's rules and defendants withdrew from the arbitration.

### 4. The billing errors

Defendants argue the arbitrator overbilled them and this is evidence of corruption, fraud, or other undue means. As noted, the alliance sustained defendants' fee challenge in part. Originally, the alliance ordered defendants to pay three-fourths of the arbitrator's fees. On December 22, 2009, the arbitrator ordered that plaintiff pay one-half of his fees and defendants pay the other one-half. By February 28, 2010, the arbitrator calculated he had expended 53.25 hours at a billing rate of $300 per hour for a total due of $15,975. Plaintiff had posted $12,000 for arbitrator fees but defendants had deposited none. On February 28, 2010, the arbitrator directed each side to post $15,000 in fees as an advance for a total of $30,000. On February 28, 2010, plaintiff, which had already deposited $12,000, was to pay an additional $16,987.50. Defendants, who had made no deposit, owed $28,987.50. On March 3, 2010, Ms. Tommaselli, the alliance's senior counsel, wrote that the February 23, 2010 arbitrator fee challenge would be processed. On March 17, 2010, Ms. Starkey reduced a January 13, 2010 invoice by 11.25 hours ($3,375) and a February 28, 2010 invoice by 6.25 hours ($1,875).

Based on Ms. Starkey's ruling, defendants argue the awards were procured by corruption, fraud or other undue means. No doubt, there are scenarios where an arbitrator's billing errors can amount to corruption, fraud, or other undue means, but this is not one of them. Defendants have failed to provide this court with many of the papers filed with the arbitrator. Included in that massive missing number of documents are the arbitrator's billing statements which Ms. Starkey relied upon in making her ruling on the billing challenge. As noted, it is defendants' burden to demonstrate error by the arbitrator and the trial court.

In any event, our extensive chronological factual recitation demonstrates that by the time the January 13 and February 28, 2010 invoices were served, both sides had litigated in the trial court, Court of Appeal and the California and United States Supreme Courts various jurisdictional and duty-to-arbitrate issues; between December 5, 2007, and January 21, 2008, litigated a motion to quash and resolved other jurisdictional issues; and on

January 21 2008, after Mr. Howsam was indicted, and in response to a stay motion and stipulation, stayed the arbitration. On June 9, 2009, the arbitrator ordered the filing of responsive pleadings. What followed was extensive arbitral litigation which included scheduling and conducting hearings, rulings on pleading challenges, addressing substantial discovery disputes, numerous stay motions filed by defendants, and fee allocation issues. It is understandable how billing errors could occur under these circumstances with fast-moving substantive challenges being pursued by both sides. Defendants have only established the arbitrator negligently miscalculated his fees. There is no evidence of fraud. The arbitrator's billing errors were corrected; defendants have presented no evidence that after Ms. Starkey's March 17, 2010 ruling, any further miscalculations occurred. The billing errors were to the detriment of each side. Also, the alliance had originally directed nine defendants to pay 75 percent of the arbitrator's fees. On December 22, 2009, the arbitrator modified the alliance's allocation to require defendants to pay only 50 percent of his fees. And as our record demonstrates, defendants never paid any fees. Arbitrators and arbitration providers have a duty to ensure litigants are correctly billed for services. Here in two invoices, the arbitrator, based on Ms. Starkey's unchallenged findings, incorrectly invoiced the parties for arbitral services. But based on all of the foregoing, we conclude defendants have failed to demonstrate the billing errors resulted in an award being procured by corruption, fraud or other undue means.

### 5. Other arguments[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D. Manifest Disregard of the Law

▉ Defendants argue the award was secured in manifest disregard of the law. Defendants argue that the award exceeds the amount specified in the September 18, 2007 arbitration demand. Referring to section 580, subdivision (a), they contend the award exceeds that allowable in the case of a default judgment. To begin with, defendants have forfeited this issue by withdrawing from the arbitration. In order to challenge an award in court, a litigant must have raised the point before the arbitrator. (*Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at pp. 30–31 [illegality issue would have been forfeited had it not been raised before the arbitrator]; *Mossman v. City of Oakdale* (2009) 170 Cal.App.4th 83, 93 [87 Cal.Rptr.3d 764] [" ' "[I]t is well settled that a party may not sit idle through an arbitration proceeding and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be adverse." ' "]; *Reed v. Mutual Service Corp.*

---

[*]See footnote, *ante*, page 790.

(2003) 106 Cal.App.4th 1359, 1372–1373 [131 Cal.Rptr.2d 524] ["Any claim of illegality must be raised before the arbitrator or it is deemed waived."]; *Paramount Unified School Dist. v. Teachers Assn. of Paramount* (1994) 26 Cal.App.4th 1371, 1386 [32 Cal.Rptr.2d 311] [noncompliance with Government Claims Act forfeited because the issue was not raised before the arbitrator].) By withdrawing, defendants have forfeited their opportunity to challenge the actual results of the arbitration on the ground there was noncompliance with section 580, subdivision (a).

 Further, defendants may not raise the issue of whether the award was secured in manifest disregard of the laws, a doctrine applicable in federal court arbitration practice. As we noted in *Countrywide Financial Corp. v. Bundy* (2010) 187 Cal.App.4th 234, 250 [113 Cal.Rptr.3d 705], the manifest disregard of the law ground for vacating an arbitration award finds its basis in several United States Supreme Court opinions. (See *Pearson Dental Supplies, Inc. v. Superior Court, supra,* 48 Cal.4th at p. 678, fn. 2.) As we explained in *Countrywide Financial Corp.,* it is unclear whether the manifest disregard of the law ground remains as basis for vacatur in federal court. (*Countrywide Financial Corp. v. Bundy, supra,* 187 Cal.App.4th at pp. 250–254; see *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.* (2010) 559 U.S. 662, ___, fn. 3 [176 L.Ed.2d 605, 130 S.Ct. 1758, 1768, fn. 3].) The federal courts of appeals are divided as to whether the arbitrator's manifest disregard of the law remains a basis for vacatur in federal court. (*Wachovia Securities LLC v. Brand* (4th Cir. 2012) 671 F.3d 472, 481 & fn. 6 [holding manifest disregard of the law remains a proper ground for vacatur and digesting varying views]; *Frazier v. CitiFinancial Corp.* (11th Cir. 2010) 604 F.3d 1313, 1324–1324 [finding manifest disregard of the law is no longer a proper vacatur ground].) But one thing is clear, an arbitrator's manifest disregard of the law is not a ground for vacatur under California law. (*Siegel v. Prudential Ins. Co.* (1998) 67 Cal.App.4th 1270, 1279 [79 Cal.Rptr.2d 726]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2011) ¶ 5:49.13, p. 5-43 (rev. # 1, 2010).) Thus, there is no merit to defendants' contention that the award resulted from a manifest disregard of the law.

### E. Excess of Powers Argument

#### 1. Overview

Defendants argue the arbitrator exceeded his powers. Section 1286.2, subdivision (a)(4) permits a trial court to vacate an award where the arbitrator exceeds his or her powers: "[T]he court shall vacate the award if the court determines . . . : [¶] . . . [¶] (4) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." Our Supreme Court has delineated the scope of

the excess of powers justification for vacatur. (*Pearson Dental Supplies, Inc. v. Superior Court, supra,* 48 Cal.4th at p. 680 ["an arbitrator whose legal error has barred an employee subject to a mandatory arbitration agreement from obtaining a hearing on the merits of a claim based on such right has exceeded his or her powers"]; *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1354–1364 [82 Cal.Rptr.3d 229, 190 P.3d 586] [parties may restrict arbitrator's powers by agreeing to expanded merit-based judicial review of an award]; *Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1182 [77 Cal.Rptr.3d 613, 184 P.3d 739] ["Absent an express and unambiguous limitation in the contract or the submission to arbitration, an arbitrator has the authority to find the facts, interpret the contract, and award any relief rationally related to his or her factual findings and contractual interpretation."]; *Morris v. Zuckerman* (1968) 69 Cal.2d 686, 691 [72 Cal.Rptr. 880, 446 P.2d 1000] ["Although the court may vacate an award if it determines that '[the] arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted' . . . , it may not substitute its judgment for that of the arbitrators." (citation omitted)].)

Defendants argue the arbitrator exceeded his powers in two respects. Initially, they argue that the arbitrator exceeded his powers by resolving plaintiff's alter ego allegations. We will discuss this issue in the published portion of the opinion. And, defendants assert the arbitrator exceeded his powers by making various discovery rulings. We disagree with defendants on both counts.

## 2. Alter ego

The arbitrator did not exceed his powers by deciding the alter ego issue. On October 25, 2004, defendants, other than Mr. Howsam and Greenlight Film & Television, Inc., served a written demand to arbitrate the claims in the first amended complaint. The arbitration clauses, which are the same in all of the assignment notices, provide for arbitration of "any" dispute between the parties. The arbitration clauses in all of the assignment notices provide in part: "Each of the parties hereto agrees that any dispute under the Distribution Agreement or this Agreement, including, without limitation, any disputes relating to Distributor's obligation to pay the Advance to the Bank when due, shall be resolved by mandatory binding arbitration . . . ." The first amended complaint contains extensive alter ego allegations. (See fn. 2, *ante.*) On October 27, 2004, those same defendants filed a motion to compel arbitration. When their motion to compel was denied, defendants appealed. And, in an unpublished opinion, we reversed the order denying the petition to compel arbitration. (*Comerica Bank v. GFT Circle Films, Inc., supra,* B180622.) On November 22, 2005, Mr. Howsam and Greenlight Film & Television, Inc.,

moved to compel arbitration. The remaining defendants who are parties to this appeal joined in the petition of Mr. Howsam and Greenlight Film & Television, Inc. The initial arbitration demand served by plaintiff attached the first amended complaint with its alter ego allegations. Thus, defendants sought arbitration of the issues raised in the first amended complaint which included the alter ego claims.

 Moreover, defendants sought arbitration under California's international commercial arbitration statutes. Section 1297.161 provides that the arbitrator may rule on his or her own jurisdiction.[10] Further, under the alliance rules, the arbitrator is charged with determining his or her powers. Rule 8.1 states, "The Arbitrator shall have all jurisdiction and powers to make rulings as to procedures for the conduct of the arbitration including, but not limited to, the situs of the arbitration, the governing law and the arbitrability of any claims or cross-claims which the Arbitrator deems necessary or proper to ensure the just, expeditious, economical and final determination of all matters in dispute." The authority to make a "final determination of all matters in dispute" includes alter ego issues which were directly posited in the first amended complaint. Having agreed to arbitrate under the alliance's arbitration rules with its broad grant of arbitrable power, defendants cannot now claim the arbitrator erred in making his alter ego findings. (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 358 [136 Cal.Rptr.3d 832].) Moreover, their alter ego analysis has no merit because defendants submitted to the alliance's international arbitration rules which vested the arbitrator with extensive powers. (*Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1447–1449 [111 Cal.Rptr.3d 468] [JAMS rule granting arbitrator authority to decide arbitrability issue enforced]; *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 557 [21 Cal.Rptr.3d 322] [American Arbitration Association rules grant of power to arbitrator to decide arbitrability issues enforced].) Further, the arbitration clause did not restrict the arbitrator from deciding alter ego issues. (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc., supra,* 203 Cal.App.4th at p. 358.) And any doubt concerning arbitrability must be resolved in favor of arbitration. (*PacifiCare Health Systems, Inc. v. Book* (2003) 538 U.S. 401, 407, fn. 2 [155 L.Ed.2d 578, 123 S.Ct. 1531]; *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 650 [89 L.Ed.2d 648, 106 S.Ct. 1415].)

---

[10] Section 1297.161 states: "The arbitral tribunal may rule on its own jurisdiction, including ruling on any objections with respect to the existence or validity of the arbitration agreement, and for that purpose, an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract, and a decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause."

Defendants argue though that an arbitrator may *never* decide alter ego issues. Defendants rely on *Retail Clerks Union v. L. Bloom Sons Co.* (1959) 173 Cal.App.2d 701, 702–703 [344 P.2d 51] (*Retail Clerks*). In that case, the plaintiff was a union which had entered into a collective bargaining agreement with the defendant, L. Bloom Sons Co. L. Bloom Sons Co. operated three shoestores in Santa Clara County. L. Bloom Sons Co. opened a fourth store in Valley Fair, which, at that time, was in an unincorporated area in Santa Clara County. (*Id.* at p. 702.) The fourth store operated as a separate corporation, Bloom's Salinas, Inc. (*Id.* at p. 703.) L. Bloom Sons Co. refused to apply the terms of the collective bargaining agreement to the employees at the new store operated by Bloom's Salinas, Inc. (*Id.* at p. 702.)

The plaintiff filed a petition to compel arbitration where the arbitrator would decide whether the collective bargaining agreement terms would apply to the new store operated by Bloom's Salinas, Inc. (*Retail Clerks, supra*, 173 Cal.App.2d at pp. 702–703.) The defendant filed an affidavit in response to the petition to compel arbitration. Defendant, L. Bloom Sons Co., denied the existence of any relationship with Bloom's Salinas, Inc. The plaintiff argued the new store operated by Bloom's Salinas, Inc., was the alter ego of L. Bloom Sons Co. The trial court ruled that any alter ego issue was to be decided in the judicial forum. The trial court then dismissed the case because Bloom's Salinas, Inc., which was never served with the petition, was an indispensible party. (*Id.* at p. 703.)

The Court of Appeal affirmed the arbitration petition's dismissal based on the absence of an indispensible party. The Court of Appeal noted it was conceded that L. Bloom Sons Co. and Bloom's Salinas, Inc., were separately incorporated. (*Retail Clerks, supra*, 173 Cal.App.2d at p. 703.) Further, the Court of Appeal expressly stated: "Bloom's Salinas, Inc., is not a party to the contract. It did not consent to have this issue decided by an arbitrator rather than by a court of competent jurisdiction." (*Ibid.*) The Court of Appeal, held in language relied upon by defendants in our case: "[Plaintiff ] maintains that Bloom's Salinas, Inc., is but the *alter ego* of [L. Bloom Sons Co.], that it has no identity apart from [L. Bloom Sons Co.], and that therefore the contract of [L. Bloom Sons Co.] is, in reality, also the contract of Bloom's Salinas, Inc. [Plaintiff] begs the question. It must first be determined whether Bloom's Salinas, Inc., is in fact but the *alter ego* of [L. Bloom Sons Co.]. [¶] A corporation's separate identity will be disregarded only when, and to the extent that, it is necessary so to do in order to prevent fraud or injustice. [Citations.] The proper forum for that determination is, of course, a court of law." (*Ibid.*)

The present case is entirely different from *Retail Clerks, supra,* 173 Cal.App.2d at pages 702–703. To begin with, defendants all agreed to arbitrate the claims contained in the first amended complaint, with its alter ego allegations, under the alliance's international arbitration rules. As noted, alliance rule 8.1 vests the arbitrator with the power to decide all issues. Defendants all filed or joined in petitions to compel arbitration. Finally, numerous California decisions hold that, depending on the circumstances, an arbitrator can decide alter ego issues. (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc., supra,* 203 Cal.App.4th at pp. 358–361; *Greenspan v. LADT, LLC, supra,* 185 Cal.App.4th at pp. 1447–1449; *Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1513 [105 Cal.Rptr.3d 585]; *Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1285 [63 Cal.Rptr.3d 787].) Defendants' argument that an arbitrator can *never* decide alter ego issues based on *Retail Clerks, supra,* 173 Cal.App.2d at page 703 is without merit.

Defendants also rely on *Carpenters 46 Northern California Conference Bd. v. Zcon Builders* (9th Cir. 1996) 96 F.3d 410, 414–416 (*Carpenters 46*). In that case, an alleged corporate alter ego, Sharon Hill, was not present at a hearing to compel arbitration. A codefendant, Zcon Builders, was subject to an arbitration agreement with a union. The alleged corporate alter ego, Sharon Hill, was not a signatory to the arbitration agreement. At issue was whether the corporation, Sharon Hill, agreed to have the arbitrator decide the alter ego issue. (*Id.* at pp. 412, 414–416.) The court of appeals found there was no evidence the alleged corporate alter ego, Sharon Hill, ever agreed to submit the alter ego issue to the arbitrator. (*Id.* at pp. 415–416.) Thus, the arbitrator did not have the power to decide the alter ego issue. (*Ibid.*)

But the Ninth Circuit panel in *Carpenters 46* distinguished that case from a prior decision with a scenario closely resembling the present case. In *Carpenters 46*, the court of appeals explained: "In *George Day Const. v. United Brotherhood of Carpenters and Joiners, Local 354*, 722 F.2d 1471, 1475 (9th Cir. 1984), we held that 'consent to grant the arbitrator such authority may be implied from the conduct of the parties in the arbitration setting.' The rationale behind our holding was that a claimant 'may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrator to act.' *George Day*, 722 F.2d at 1475 (citing *Ficek v. Southern Pacific Co.*, 338 F.2d 655, 657 (9th Cir. 1964))." (*Carpenters 46, supra,* 96 F.3d at p. 415.) As can be noted, *Carpenters 46, supra,* 96 F.3d at pages 415–416 has no relationship to the facts in this case. Here, defendants actively sought to arbitrate under broadly stated alliance rules and an international arbitration statute, section 1297.161.

The limited scope of *Carpenters 46, supra*, 96 F.3d at pages 415–416, is illustrated by a subsequent Ninth Circuit opinion. In *Pacesetter Construction v. Carpenters 46 Northern California* (9th Cir. 1997) 116 F.3d 436, 440, the court of appeals explained: "Our conclusion that the Board of Adjustment had authority to decide the arbitrability of Pacesetter's dispute is not inconsistent with our recent decision in *Carpenters 46 No. Cal. Counties Conf. Bd. v. Zcon Builders*[, *supra*], 96 F.3d 410. In *Zcon*, an arbitrator had held that a corporation's dispute with a union was arbitrable because the corporation was the alter ego of an employer that had signed an arbitration agreement. We held that the corporation, which denied that it was a party to the collective bargaining agreement, was not bound by the arbitrator's decision of arbitrability. *Id.* at 414–16. Our decision, however, was based on the fact that the objecting corporation had never appeared at the arbitration, and consequently never evinced its intent to allow the arbitrator to decide arbitrability, within the meaning of *George Day. Id.* at 415–16. Pacesetter, in contrast, appeared before the arbitrator, contested arbitrability and the merits of the dispute, and made no reservation of its right to reserve the issue of arbitrability for initial determination by a court. *George Day*, and not *Zcon*, governs Pacesetter's case." The same is true in this case. *Carpenters 46, supra*, 96 F.3d at pages 415–416 is not controlling. As in the case of California's jurisprudence, the Ninth Circuit had held that, depending on the circumstances, arbitrators can decide alter ego issues. (*Local Joint Executive Bd. v. Royal Center, Inc.* (9th Cir. 1986) 796 F.2d 1159, 1164–1165; see *Mundi v. Union Security Life Ins. Co.* (9th Cir. 2009) 555 F.3d 1042, 1045; *Comer v. Micor* (9th Cir. 2006) 436 F.3d 1098, 1101; *CMSH Co., Inc. v. Carpenters Trust Fund for Northern California* (9th Cir. 1992) 963 F.2d 238, 241.) Here, the arbitrator possessed the power to adjudicate the alter ego issue.

### 3. Discovery orders[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### F.–I.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 790.

## V. DISPOSITION

The judgment is affirmed. Plaintiff, Comerica Bank, shall recover its costs incurred on appeal from defendants: Greenlight Film & Television, Inc., Gary Howsam, GFT Circle Films, Inc., Road Rage Films, Inc., Janus Productions, Inc., GFT Going Back Films, Inc., GFT Heresy Films, Inc., GFT/Redwood KOTN Films, Inc., and GFT/Redwood Ignition Films Inc. Any request for attorney fees on appeal shall be pursued pursuant to California Rules of Court, rules 3.1702(c)(1) and 8.278(c)(1).

Mosk, J., and Kriegler, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 14, 2012, S205706.